1  John R. Alcorn, Attorney at Law
2  17310 Red Hill Ave., Ste. 140
   Irvine, CA 92614
   California State Bar No.: 92482
3  Admitted to Southern District
   Of California on March 17, 1989
4



FILED

MAR 2 6 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

5

6

7              UNITED STATES DISTRICT COURT

8        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

9              EL CENTRO, CALIFORNIA DIVISION

10

11

12  Phaly Rin,                              )
13  A#25-334-107                            )
                                            )
14          Plaintiff,                      )   Civ. No.:'08 CV 0571 JM WMc
                                            )
15          v.                              )   Judge:
                                            )
16  R. Michael Magee, Assistant Field Office )   Mag. Judge: _____
                                            )
17  Director, DHS, El Centro Detention Facility; )   PETITION FOR WRIT OF HABEAS
                                            )   CORPUS BY A PERSON IN FEDERAL
18  Julie L. Myers, Assistant Secretary, ICE; and )   CUSTODY PURSUANT TO
                                            )   28 U.S.C.§ 2241
19  Michael Chertoff, Secretary of Homeland )
                                            )
20  Security                               )
                                            )
21          Defendants.
22  _____

23      **PETITION FOR A WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241**

24          Plaintiff, **Phaly Rin,** by and through his undersigned counsel, John R. Alcorn,

25  hereby petitions this Court for a Writ of Habeas Corpus to remedy his unlawful detention,

26  and to enjoin his continued unlawful detention by the Defendants.  In support of this

27  petition and complaint for injunctive relief, Plaintiff alleges as follows:

28

# CUSTODY

1. Plaintiff is in the physical custody of the Department of Homeland Security ("DHS"), Bureau of Immigration and Customs Enforcement's ("ICE") El Centro Detention Facility in El Centro, California.

2. This action arises under the Constitution of the United States, and the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., as amended by the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 1570, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. This Court has jurisdiction under 28 U.S.C. § 1331, as the Plaintiff is presently in custody under color of the authority of the United States, and such custody is in violation of the Constitution, laws, or treaties of the United States.[1] This Court may grant relief pursuant to 28 U.S.C. § 2241, 5 U.S.C. § 702, and the All Writs Act, 28 U.S.C. § 1651.

# VENUE

3. Venue lies in the United States District Court for the Southern District of California, the judicial district in which the Plaintiff resides.[2]

---

[1]  See Zadvydas V. Davis, 533 U.S. 678, 121 S.Ct. 2491 (2001).

[2]  28 U.S.C. § 1391 (e)

4. Plaintiff, Phaly Rin, is a native and citizen of Cambodia. He has been in DHS custody since March 10, 2008. An Immigration Judge in Boston, Massachusetts ordered the Plaintiff to be deported on February 8, 1993 in absentia. In that this order was issued in absentia, the Plaintiff did not appeal the Immigration Judge's decision, and thus the order became final.

5. Defendant R. Michael Magee is the Assistant Field Office Director, DHS, El Centro Detention Facility. In this official capacity, Mr. Magee is a legal custodian of the Plaintiff.

6. Defendant Julie L. Myers is the Assistant Secretary of ICE. She is responsible for the administration of the DHS and the implementation and enforcement of the Immigration and Nationality Act ("INA"). As such, she is also a custodian of the Plaintiff.

7. Defendant Michael Chertoff is the Secretary of Homeland Security of the United States and is responsible for the administration of the DHS and the implementation and enforcement of the INA. As such, he has ultimate custodial authority over the Plaintiff

## EXHUASTION OF REMEDIES

8. Plaintiff has exhausted his administrative remedies to the extent required by law, and his only remedy is by way of this judicial action. No statutory exhaustion requirements apply to Plaintiff's claim of unlawful detention.

**STATEMENTS OF FACTS**

9. Plaintiff first arrived in the United States on or about the year of 1982 via O'Hare International Airport in Chicago and was admitted upon inspection by the INS (Since, the DHS). He was admitted after inspection. Plaintiff has been physically in the United States since his entry into the country.

10. The Plaintiff believes he pleaded guilty to a criminal charge in Massachusetts in the 1980's and that the state judge granted a "Judicial Recommendation Against Deportation" ("JRAD") at that time. Congress amended the Immigration and Nationality Act to eliminate "JRADs" in 1990. Plaintiff retained the undersigned as counsel one week ago, on Monday, March 24, 2008. The undersigned visited Plaintiff in custody in El Centro, California yesterday, March 23, 2008.

11. The Plaintiff was taken into custody by ICE, and has been in ICE custody, since his arrest on March 10, 2008.

**LEGAL FRAMEWORK FOR RELIEF SOUGHT**

12. The Plaintiff is in custody pursuant to INA § 241(a), 8 U.S.C. § 1231 (a).

13. Plaintiff believes that ICE will physically remove him from the United States to Cambodia sometime in the next two weeks. This removal would be illegal if the 1993 in absentia order of deportation against Plaintiff is illegal, as it might be if there was in fact a "JRAD" issued on behalf of Plaintiff.

# CLAIMS FOR RELIEF

# COUNT ONE

# STATUTORY VIOLATION

14. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 13 above.

15. Plaintiff's continued detention by the Defendant may violate INA § 241(a)(6), as the undersigned counsel respectfully requests a stay of deportation for 180 days so that he can research Defendant's criminal history to determine if a JRAD was issued on his behalf, and, if so, what its legal effect in this Circuit is. Two 9th Circuit Cases on JRAD are attached (United States v. Yacoubian, 24 F.3d 1 (9th Cir., 1994); United States v. Hovsepian, 359 F.3d 1144 (9th Cir., 2004)), and as is evident, this is a very complex legal matter. Also enclosed is a Declaration executed by Defendant yesterday.

# PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court grant the following relief:

1. Assume jurisdiction over this matter;
2. Order the DHS to hold Plaintiff in custody in El Centro and not remove him from the United States for 180 days, or in the alternative;
3. Grant Plaintiff a Writ of Habeas Corpus directing the Defendants to immediately release the Plaintiff from custody; and
4. Grant any other further relief, which this Court deems just and proper.

1  I affirm, under penalty of perjury that the foregoing is true and correct based on
2  my knowledge and belief.

3

4                                    Respectfully Submitted,

5                                    Dated this 24th day of March, 2008

6

7                                    _John R. Alcorn_
                                     John R. Alcorn, Attorney at Law
8  ///                               Attorney for Plaintiff
                                     Phaly Rin
9  ///

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBITS

1.  Declaration of Phaly Rin

2.  United States v. Yacoubian, 24 F.3d 1 (9th Cir., 1994)

3.  United States v. Hovsepian, 359 F.3d 1144 (9th Cir., 2004)),

DECLARATION OF PHALY RIN

I, Phaly Rin, I declare under penalty of perjury that the foregoing is true and correct:

1.  I was born on October 20, 1969 in Cambodia (formerly Kampuchea).
2.  I arrived in the United States as a refugee from Cambodia on May 3, 1982.
3.  My Alien Registration Number is A25-334-107
4.  I was arrested in Massachusetts sometime in the 1980's.  I do not remember the charge, but I do remember that I pleaded guilty and that the State Judge guaranteed me that I could not be deported as a result of this conviction.
5.  I was ordered deported in absentia from the United States by an Immigration Judge in Boston, Massachusetts on February 8, 1993.
6.  I am currently being detained in El Centro, California by the Department of Homeland Security (DHS).
7.  DHS has told me that I will be deported to Cambodia in the very near future.

_Phaly Rin_                              Date: _3/23/08_
Phaly Rin

Witness: _John R. Alco_                  Name: _03/23/2008_
      Signature                                Print

Witness: _____                  Name: _____
      Signature                                Print

**EXHIBIT** _1_

000069

14 of 123 DOCUMENTS

**UNITED STATES OF AMERICA, Plaintiff-Appellant, v. VIKEN HOVSEPIAN; VIKEN YACOUBIAN, Defendants-Appellees. VIKEN HOVSEPIAN, Plaintiff-Appellee, v. UNITED STATES OF AMERICA; JOHN ASHCROFT, Attorney General, United States Department of Justice, Defendants-Appellants. VIKEN HOVSEPIAN; VIKEN YACOUBIAN, Plaintiffs-Appellees, v. UNITED STATES OF AMERICA; JOHN ASHCROFT, Attorney General, United States Department of Justice, Defendants-Appellants.**

**No. 99-50041, Nos. 99-56922, 00-55320, No. 01-55247**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*359 F.3d 1144; 2004 U.S. App. LEXIS 3959; 13 A.L.R. Fed. 2d 845*

**June 17, 2003, Argued and Submitted En Banc, San Francisco, California
March 2, 2004, Filed**

**SUBSEQUENT HISTORY:** Appeal after remand at *United States v. Hovsepian, 2005 U.S. App. LEXIS 19214 (9th Cir. Cal., Sept. 6, 2005)*

**PRIOR HISTORY:** [**1] Appeals from the United States District Court for the Central District of California. D.C. No. CR-82-0917-MRP, D.C. No. CV-98-01001-MRP, D.C. No. CV-98-01001-MRP. Mariana R. Pfaelzer, District Judge, Presiding.
*United States v. Hovsepian, 326 F.3d 1041, 2003 U.S. App. LEXIS 6523 (9th Cir., 2003)*

**DISPOSITION:** Reversed and remanded. Vacated in part.

**COUNSEL:** Jean Rosenbluth, Assistant United States Attorney, Los Angeles, California; Lawrence E. Kole, Assistant United States Attorney, Santa Ana, California, for the plaintiff-appellant-defendants-appellants.

Michael J. Lightfoot, Lightfoot, Vandevelde, Sadowsky, Medvene & Levine, Los Angeles, California; Paul J. Estuar and Barrett S. Litt, Litt & Associates, Los Angeles, California, for the defendants-appellees-plaintiffs-appellees.

**JUDGES:** Before: Mary M. Schroeder, Chief Judge, and Dorothy W. Nelson, Andrew J. Kleinfeld, Michael Daly Hawkins, Sidney R. Thomas, Susan P. Graber, M. Margaret McKeown, Ronald M. Gould, Richard A. Paez, Marsha S. Berzon, and Richard R. Clifton, Circuit Judges. Opinion by Judge Graber.

**OPINION BY:** Susan P. Graber

**OPINION**

[*1147] GRABER, Circuit Judge:

On August 18, 2000, the district court administered the oath of citizenship to Appellees Viken Hovsepian and Viken Yacoubian. That naturalization ceremony was the culmination of a 16-year struggle between Appellees [**2] and the Immigration and Naturalization Service ("INS"), [1] which had sought to deport them. In this appeal, the INS argues that the district court's decision to naturalize Appellees was fundamentally flawed. The district court dealt admirably with this complex case over a long period of time. Because, however, the district court committed legal errors that caused it to analyze Appellees' naturalization applications incompletely, we must reverse and remand for further proceedings.

> 1   The INS is now called the Bureau of Citizenship and Immigration Services. For the sake of consistency, we will refer to it as the INS throughout this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

*A. Hovsepian's and Yacoubian's Convictions and Sentencing*

In 1982, the Federal Bureau of Investigation ("FBI") discovered, through intercepted telephone calls, that Appellees Viken Hovsepian and Viken Yacoubian were planning to bomb the offices of the Honorary Turkish Consul General in Philadelphia, Pennsylvania. Appellees allegedly [**3] were associated with the Justice Com-

EXHIBIT 2

008010

359 F.3d 1144, *; 2004 U.S. App. LEXIS 3959, **;
13 A.L.R. Fed. 2d 845

mandoes of the Armenian Genocide, an organization dedicated to exacting revenge against Turkey for atrocities committed against Armenians. Appellees had arranged for a coconspirator to transport the [*1148] bomb on a commercial airliner from Los Angeles to Boston. Although the coconspirator managed to board a plane at Los Angeles International Airport, carrying the bomb in his checked baggage, the FBI arrested him and seized the bomb once the plane landed. The FBI later estimated that the bomb, if detonated, likely would have killed between 2,000 and 3,000 people.

Appellees were arrested and charged with (1) conspiracy to transport explosive materials in interstate commerce and to damage by explosives property engaged in interstate commerce, in violation of *18 U.S.C. § 371*; (2) transporting explosives in interstate commerce with intent to cause injury or damage, in violation of *18 U.S.C. § 844(d)*; and (3) possessing an unregistered firearm (an improvised explosive device), in violation of *26 U.S.C. § 5861(d)*. After a bench trial in 1984, Appellees were convicted on all three counts of [**4] the indictment.

On January 25, 1985, the district court sentenced Hovsepian. Because Hovsepian was younger than 26 when he committed the offenses, the district court had the option of sentencing him under the *Federal Youth Corrections Act* ("FYCA"). However, both Hovsepian and the district judge agreed that he would not benefit from a sentence under FYCA. Accordingly, the court sentenced him as an adult to one five-year and two six-year terms of imprisonment, to be served concurrently. In conjunction with the sentence, the district court issued a Judicial Recommendation Against Deportation ("JRAD"), which barred the INS from deporting Hovsepian on the basis of his convictions.

The district court granted Yacoubian a new trial on the ground that he had lacked an adequate opportunity to cross-examine some of the INS's witnesses. This court reversed, however. *United States v. Yacoubian, 857 F.2d 1480 (9th Cir. 1988)* (unpublished disposition). After our remand, the district court sentenced Yacoubian on October 30, 1989. Although he, too, was eligible for a sentence under FYCA, the district court made no findings with respect to whether Yacoubian would benefit from a youth [**5] sentence. Instead, the court simply sentenced him as an adult to two concurrent three-year terms of imprisonment and an additional year of probation with a condition of 1,000 hours of community service. The court also issued a JRAD for Yacoubian, prohibiting the INS from deporting him because of his convictions.

B. *Hovsepian's and Yacoubian's Subsequent Accomplishments*

Appellees served their full prison terms. After being released from prison, both have led exemplary lives.

Viken Hovsepian earned a Ph.D. in international relations from the University of Southern California and manages a hedge fund in Southern California. He resides with his wife of many years, and their daughter, in Santa Monica. Dr. Hovsepian is viewed as a leader of the Armenian community in the Los Angeles area and has played an active role in serving his church.

Viken Yacoubian earned a master's degree in psychology from Loyola Marymount University and enrolled in a doctoral program in counseling and psychology at the University of Southern California. He serves as the principal of the Rose and Alex Pilibos Armenian High School in Los Angeles, a program praised for its rigorous preparation of students [**6] bound for college, and is an adjunct professor at Woodbury University. He volunteers his time to work with children in the Armenian community in Los Angeles. Mr. Yacoubian, too, has been married for many years, and he resides in Glendale with his wife.

[*1149] C. *The INS's Efforts to Deport Hovsepian and Yacoubian*

When the district court sentenced Hovsepian and Yacoubian, there was no deportation provision relevant to them. There is no dispute that Hovsepian and Yacoubian were convicted of a crime that qualified as a crime of moral turpitude as defined by the immigration law at the time of the criminal proceedings. However, under the former immigration scheme, when a lawful permanent resident committed a crime of moral turpitude, he or she became deportable if he or she committed the crime within five years of entry or committed two crimes of moral turpitude at any time. *See 8 U.S.C. § 1251(a)(4) (1985)* (now codified at *8 U.S.C. § 1227(a)(2)(A)(I) & (ii))*. Because Hovsepian and Yacoubian had been lawful permanent residents for more than five years at the time of the offense, and because neither had a prior record, their convictions [**7] did not constitute deportable offenses under the operative immigration laws.

Nonetheless, as noted above, Hovsepian and Yacoubian sought, and the district court granted, their requests for issuance of a JRAD. If Hovsepian or Yacoubian had been convicted of another crime, the JRAD would have prevented the first conviction from serving as one of the two predicate crimes that were required to constitute a ground of deportability. *See 8 U.S.C. § 1251(b)(2)* (repealed 1990).

In 1988, Congress amended the immigration laws to render deportable any alien who had been convicted of possessing an unlawful destructive device or other fire-

359 F.3d 1144, *; 2004 U.S. App. LEXIS 3959, **;
13 A.L.R. Fed. 2d 845

arm. Pub. L. No. 100-690, § 7348(b), 102 Stat. 4181, 4473 (1988). In 1990, Congress made this ground for deportation retroactive. Pub. L. No. 101-649, § 602(c), 104 Stat. 4978, 5081-82 (1990). Under those amendments, both Hovsepian and Yacoubian were subject to deportation because they had been convicted of possession of an unlawful destructive device. *See 8 U.S.C. § 1227(a)(2)(C).*

The INS placed a detainer on Yacoubian in May 1991 as a prelude to deporting him. In response, Yacoubian moved the district [**8] court for an injunction preventing his deportation, claiming that the JRAD that the court had issued in 1989 protected him from deportation on the basis of his 1984 convictions.

The district court issued an injunction, but this court reversed. *United States v. Yacoubian, 24 F.3d 1 (9th Cir. 1994).* We held that Congress' amendment of the immigration laws provided a new ground for deporting Yacoubian that was not covered by the JRAD. *Id. at 7, 10.* Further, we held that Congress' retroactive amendment of the immigration laws did not violate due process, separation of powers, or the *ex post facto* clause. *Id. at 7-10.* Accordingly, we held that Yacoubian was deportable despite the district court's issuance of a JRAD at the time he was sentenced. *Id. at 10.* [2]

> 2  Although Hovsepian was not a party to that case, the logic of our decision applies equally to him. Thus, the JRAD issued at the time of his sentencing does not bar the INS from deporting him on any ground subsequently enacted by Congress and made retroactive.

[**9] On August 12, 1997, the district director of the INS signed formal charging documents for removal proceedings, known as Notices to Appear, against Appellees. The INS also signed arrest warrants naming Appellees. However, the INS did not file those documents with the immigration court.

### D. *The INS's Rule 36 Motion*

On June 3, 1997, the INS filed a motion pursuant to *Federal Rule of Criminal Procedure 36*, seeking to correct typographical errors in Hovsepian's and Yacoubian's [*1150] criminal judgments and commitment orders. The INS conceded that the purpose of the motion was to facilitate the initiation of deportation proceedings against Hovsepian and Yacoubian. On June 29, 1998, the district court denied the INS's *Rule 36* motion.

### E. *Resentencing Under Rule 35 and Writ of Audita Querela*

On October 6, 1997, while the INS's *Rule 36* motion was pending, Hovsepian and Yacoubian filed motions to correct their sentences. Arguing that the sentences imposed by the district court were illegal, they sought relief through *Federal Rule of Criminal Procedure 35*, which provided that "[a] court may correct [**10] an illegal sentence at any time." *Fed. R. Crim. P. 35(a)* (repealed). They also argued that they were entitled to correction of their sentences by writ of audita querela.

The INS did not object to the district court's resentencing of Yacoubian. When Yacoubian initially was sentenced, the district court had failed to make a finding that he would not benefit from a sentence under FYCA. Because the court had the authority to sentence him as an adult only if it first made such a finding, Yacoubian's sentence was illegal. *Dorszynski v. United States, 418 U.S. 424, 425-26, 41 L. Ed. 2d 855, 94 S. Ct. 3042 (1974); 18 U.S.C. § 5010 (1982)* (repealed 1984). The district court, therefore, had the power to resentence him "at any time." *Fed. R. Crim. P. 35(a).*

By contrast, the district court had made a finding at Hovsepian's initial sentencing that he would not benefit from a sentence under FYCA. Therefore, the INS argued that Hovsepian's sentence was not illegal and opposed his motion for resentencing.

Over the INS's objection, the district court granted Hovsepian's *Rule 35* motion. [**11] It also held that the writ of audita querela provided an additional method by which the court could resentence Hovsepian.

### F. *Order Sealing Appellees' Conviction Records*

When Appellees were convicted in 1984, FYCA provided for the setting aside of some youth convictions:

> Where a youth offender has been placed on probation by the court, the court may thereafter, in its discretion, unconditionally discharge such youth offender from probation prior to the expiration of the maximum period of probation theretofore fixed by the court, which discharge shall automatically set aside the conviction, and the court shall issue to the youth offender a certificate to that effect.

*18 U.S.C. § 5021(b) (1982)* (repealed 1984).

The district court set aside Appellees' convictions pursuant to FYCA. Hovsepian and Yacoubian then moved the district court to seal all records related to their convictions. The district court granted their motion and issued a broad sealing order, which provided:

> 1. The records of the Federal Bureau of Investigation ("FBI") will be corrected to reflect that the 1998 convictions in this

matter of defendants Viken Yacoubian and Viken [**12] Hovsepian (the defendants) were set aside under the provisions of the Federal Youth Corrections Act ("FYCA"), *18 U.S.C. § 5021* (repealed in 1984);

2. All records, documents and materials relating to the defendants' conviction, sentencing, appeal and post-conviction proceedings shall be expunged by the FBI by physically removing all such items from its own files and from all law enforcement authorities and placed in a separate storage facility which is not to be opened other than in the course of a bona fide criminal investigation by law [*1151] enforcement authorities, and only where necessary for such an investigation. Except for a bona fide criminal investigation, no governmental agency or official, including the INS, may use, directly or indirectly, any information or materials relating to, or derived from, the records and documents that were the subject of this case;

3. These records may not be disseminated to, or used by, anyone, public or private, for any other purpose;

4. In the event the FBI receives any inquiries about the defendants' FYCA conviction records, it shall not respond in the affirmative based on the set-aside convictions;

5. This Court's own [**13] records of this case, as to defendants Viken Yacoubian and Viken Hovsepian, shall be kept under seal and not opened except upon further order of this Court;

6. Viken Yacoubian and Viken Hovsepian may, and all others must, consider, for all purposes, the aforesaid conviction as expunged and as never having occurred.

### G. *Injunction Barring Hovsepian's Deportation*

As an added safeguard against deportation, Hovsepian filed a complaint in the district court on June 14, 1999, seeking (among other things) a permanent injunction barring the INS from applying the 1988 and 1990 statutory changes to him. The district court granted Hovsepian's motion. It enjoined the INS from "treating

Mr. Hovsepian any differently than they would be entitled to treat him under the standards in force in 1985 for individuals convicted of a crime from whom recommendation against deportation was entered by the court." The injunction forbade the INS from deporting Hovsepian based on the 1988 and 1990 amendments to the immigration laws. Thus, the practical effect of the injunction was to make the district court's previously issued JRAD a complete bar to the INS's attempts to deport Hovsepian.

### H. [**14] *Naturalization Proceedings*

In the midst of the litigation, Hovsepian and Yacoubian filed naturalization applications with the INS. On January 15, 1999, the INS interviewed Appellees in connection with their applications. In both their interviews and their applications, Appellees refused to answer some questions about their backgrounds, claiming that the questions violated the district court's sealing order. The INS determined that a second interview was necessary and scheduled it for May 6, 1999. Appellees' lawyer had a scheduling conflict, so they requested that the interview date be changed. The INS rescheduled the interviews for May 13, but Appellees did not receive notice until the day before the interviews were to take place. Therefore, they again requested a change of date. Although they suggested May 14 as a possible alternative, the INS was not able to interview Yacoubian and Hovsepian until May 18 and May 25, respectively.

More than 120 days elapsed between Appellees' first and second interviews. On June 14, 1999, Hovsepian and Yacoubian asked the district court to adjudicate their naturalization applications pursuant to *8 U.S.C. § 1447(b)*. That [**15] statute provides that, if the INS fails to make a decision regarding a naturalization application within 120 days of an applicant's first interview,

> the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the [*1152] matter, with appropriate instructions, to the Service to determine the matter.

*8 U.S.C. § 1447(b)*.

The district court took jurisdiction over Appellees' naturalization applications. Shortly thereafter, the INS purported to deny the applications. Nonetheless, the district court continued to consider the applications, eventually holding a de novo hearing on them. After the hearing, the court issued an order requiring the INS to grant

359 F.3d 1144, *; 2004 U.S. App. LEXIS 3959, **;
13 A.L.R. Fed. 2d 845

Appellees' naturalization applications and, on August 18, 2000, the court administered the oath of citizenship to Appellees.

### I. *Panel Opinion*

A three-judge panel of this court reversed the district court in almost every respect. [3] *See United States v. Hovsepian, 307 F.3d 922 (9th Cir. 2002).* The panel held that neither [**16] *Rule 35* nor the writ of audita querela offered an appropriate vehicle for resentencing Hovsepian under FYCA. *Id. at 928.* Accordingly, the panel held that the district court erred in setting aside Hovsepian's conviction and in sealing the records of that conviction. *Id.* The panel also held that the district court erred in issuing an injunction barring the INS from deporting Hovsepian on any ground not in existence at the time of his original sentencing. *Id. at 930-31.*

> 3    The panel affirmed the district court's ruling with respect to the INS's *Rule 36* motion. *Hovsepian, 307 F.3d at 934.*

With respect to Yacoubian, the panel held that, although he was properly resentenced under FYCA, the district court's order sealing the records of his conviction was too broad. *Id. at 930.*

The panel also held that the district court erred in naturalizing Hovsepian and Yacoubian. *Id. at 933.* It held that, although the district court did gain [**17] jurisdiction over the naturalization applications through § 1447(b), the court did not gain exclusive jurisdiction. *Id. at 932-33.* Instead, it held, the district court shared concurrent jurisdiction with the INS. *Id.* Thus, the panel held that when the INS denied Appellees' naturalization applications, the district court should have remanded the matter to the INS and should have refused to act until after the Appellees exhausted their administrative remedies. *Id. at 933-34.*

The court then took this case en banc. *United States v. Hovsepian, 326 F.3d 1041 (9th Cir. 2003).*

### DISCUSSION

As noted, the district court handled this long and complicated case masterfully in most respects. Nonetheless, we hold that the district court erred in a few particulars, which we will discuss in turn:

> . The court committed errors of law by resentencing Hovsepian and by sealing the records of his conviction.
>
> . The court erred in granting an injunction barring the INS from deporting Hovsepian on any ground not in existence at the time of his original sentencing.

> . Although the court properly resentenced Yacoubian under FYCA, the order [**18] that it issued sealing Yacoubian's conviction records was too broad.
>
> . Finally, although the district court properly exercised exclusive jurisdiction over Appellees' naturalization applications pursuant to *8 U.S.C. § 1447(b),* the court failed to undertake a complete analysis of those applications because it did not consider certain evidence.

For these reasons, we reverse and remand for further proceedings, while retaining jurisdiction.

[*1153] A. *Rule 36 Motion*

For the reasons stated by the three-judge panel, *Hovsepian, 307 F.3d at 934,* the district court did not abuse its discretion in denying the *Federal Rule of Criminal Procedure 36* motion.

### B. *Hovsepian's Resentencing*

In response to the INS's efforts to deport him, Hovsepian filed a motion asking the court to resentence him under *Federal Rule of Criminal Procedure 35* or, alternatively, by writ of audita querela. [4] The district court granted Hovsepian's motion on both grounds.

> 4    Yacoubian filed a similar motion. However, as discussed above, the INS concedes that the district court properly resentenced him under *Rule 35.* We therefore address only Hovsepian's resentencing.

[**19] Because Hovsepian committed his offense before November 1, 1987, we review the district court's decision to resentence him pursuant to *Rule 35* for "illegality or gross abuse of discretion." *United States v. Stump, 914 F.2d 170, 172 (9th Cir. 1990).* We review de novo the district court's decision to grant a writ of audita querela. *United States v. Valdez-Pacheco, 237 F.3d 1077, 1079 (9th Cir. 2001) (per curiam).*

### 1. *Rule 35*

At the time of Hovsepian's resentencing, *Rule 35(a)* provided that "[a] court may correct an illegal sentence at any time." *Fed. R. Civ. P. 35(a)* (repealed). We have defined an "illegal sentence" as "one which is not authorized by the judgment of conviction, or is in excess of the permissible statutory penalty for the crime, or is in violation of the constitution." *United States v. Johnson, 988 F.2d 941, 943 (9th Cir. 1993).* A mistake of fact of "constitutional magnitude" made by a sentencing court also can render a sentence illegal. *United States v. Tucker,*

359 F.3d 1144, *; 2004 U.S. App. LEXIS 3959, **;
13 A.L.R. Fed. 2d 845

*404 U.S. 443, 447, 30 L. Ed. 2d 592, 92 S. Ct. 589 (1972).*

Hovsepian's sentence was certainly authorized by [**20] his judgment of conviction and was not in excess of the permissible statutory penalty for his crime. Thus, Hovsepian argued before the district court that his sentence was "illegal" because the court had made a mistake of fact of constitutional magnitude when it assumed that a JRAD would categorically bar the INS from deporting him on the basis of his conviction. As relief for the court's alleged mistake of fact, Hovsepian sought resentencing under FYCA and expungement of his conviction.

The district court granted Hovsepian's *Rule 35* motion on two grounds. First, it held that it had made mistakes of fact in Hovsepian's original sentencing that had rendered his sentence illegal. Second, the court held that subsequent changes in immigration law had frustrated the district court's sentencing intentions. Neither justification was a valid basis for granting Hovsepian's motion.

First, although the court did make an erroneous assumption that the JRAD would forever bar the INS from deporting Hovsepian, this assumption was not a mistake of fact of "constitutional magnitude." We are not faced here with a situation like that in *Tucker*, in which a sentence was imposed based at least in part [**21] on an earlier conviction that was unconstitutionally obtained without the assistance of counsel. *Tucker, 404 U.S. at 444-45.* Similarly, we are not faced with a situation like that in *Davis v. United States, 417 U.S. 333, 340-41, 41 L. Ed. 2d 109, 94 S. Ct. 2298 (1974),* in which a change in the substantive law established that the conduct for which the petitioner had been convicted and sentenced was actually lawful. Instead, Hovsepian's acts were and are [*1154] crimes, his convictions were constitutionally obtained, and his sentence was perfectly legal both before and after Congress amended the INA to add new grounds for deportation. The amendments merely "affected the way in which the court's judgment and sentence would be enforced but . . . did not affect the lawfulness of the judgment itself -- then or now." *United States v. Addonizio, 442 U.S. 178, 187, 60 L. Ed. 2d 805, 99 S. Ct. 2235 (1979).*

Second, the fact that the district court did not anticipate a future change in immigration law that frustrated the court's sentencing intentions is simply not an event that can make a sentence "illegal." Later changes that affect the collateral consequences flowing from a lawful [**22] sentence do not transform the sentence into an illegal one. In rejecting a similar argument, the Supreme Court noted that "the subjective intent of the sentencing judge would provide a questionable basis for testing the validity of [a] judgment." *Id. at 187; see id.* (holding that the defendants were not entitled to relief even

though a post-sentencing change in the policies of the United States Parole Commission prolonged the defendants' imprisonment beyond the period intended by the sentencing judge). We, too, have held that frustration of the subjective intent of the sentencing judge is an insufficient ground to justify vacation or amendment of a sentence. *Jones v. United States, 783 F.2d 1477, 1478 (9th Cir. 1986).*

For these reasons, the district court committed an error of law in resentencing Hovsepian pursuant to *Federal Rule of Criminal Procedure 35.*

## 2. *Writ of Audita Querela*

In addition to granting Hovsepian's *Rule 35* motion, the district court held, in the alternative, that it could resentence him by granting his request for a writ of audita querela. *Hovsepian, 307 F.3d at 926.* [**23] Audita querela was a common law writ issued "to afford relief to a judgment debtor against a judgment or execution because of some defense or discharge arising subsequent to the rendition of the judgment or the issue of the execution." *United States v. Fonseca-Martinez, 36 F.3d 62, 63-64 (9th Cir. 1994)* (per curiam) (internal quotation marks omitted).

A person seeking a writ of audita querela must show a legal defense or discharge to the judgment. *Doe v. INS, 120 F.3d 200, 204 (9th Cir. 1997).* A "legal defense" concerns a "legal defect" in the underlying sentence or conviction. *Id. at 203.* The writ is unavailable to those who seek it on purely equitable grounds. *Id. at 204.*

Hovsepian argues that the district court's misunderstanding of the immigration consequences of sentencing him as an adult constitutes such a legal defect in his sentence. As discussed above, however, the district court's erroneous assumption that the immigration laws would remain constant cannot constitute a "legal defect" in Hovsepian's sentence. In fact, in *Doe* we expressly held that the fact that a conviction will have negative immigration [**24] consequences is *not* a valid ground for granting the writ. *Id. at 202; see also United States v. Tablie, 166 F.3d 505, 507 (2d Cir. 1999)* (per curiam) (applying *Doe* and holding that a district court could not grant a writ of audita querela to an alien who had received a JRAD but, like Appellees, was nonetheless facing deportation). Along the same lines, we recently noted that

> vacation of a conviction on the ground that a federal court thinks it is unfair that an alien will be deported as a result of that conviction usurps the power of Congress to set naturalization and deportation standards and the power of the INS to admin-

ister those standards [*1155] in each individual case. Congress has the power to create collateral consequences of a criminal conviction.

*United States v. Bravo-Diaz, 312 F.3d 995, 998 (9th Cir. 2002)* (citation and internal quotation marks omitted).

Therefore, the district court erred in resentencing Hovsepian under a writ of audita querela.

### C. *Injunction Barring Hovsepian's Deportation*

The district court issued an injunction barring the INS from deporting Hovsepian on any ground not in [**25] existence at the time of his original sentencing in 1985. Because Hovsepian improperly was resentenced under FYCA, the district court erred in setting aside his conviction and ordering the records of that conviction sealed. Thus, the only thing standing between him and deportation is the district court's order barring the INS from commencing deportation proceedings on any ground not in existence at the time of his initial sentencing. Unfortunately for Hovsepian, the district court also erred in issuing that order.

#### 1. *Jurisdiction*

Whether a district court possesses the authority to issue an injunction is a question of law that we review de novo. *Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 874 (9th Cir. 1999).*

Title *8 U.S.C. § 1252(g)* provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders." That provision does not bar the injunction proceeding here, however, because the gravamen of Hovsepian's claim does not arise from the Attorney General's decision or action [**26] to commence proceedings, adjudicate cases, or execute removal orders.

In *Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471, 482, 142 L. Ed. 2d 940, 119 S. Ct. 936 (1999)*, the Supreme Court emphasized that the provision applies only to the discrete listed actions. As the Court noted, "*Section 1252(g)* was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *Id. at 485 n.9.* In other contexts, we have followed the Court's instruction to interpret *§ 1252(g)* narrowly. *See, e.g., Barahona-Gomez v. Reno, 236 F.3d 1115, 1120-21 (9th Cir. 2001)* (holding that *§ 1252(g)* did not bar issuance of a preliminary injunction restricting the implementation of a directive that had halted the grant of suspensions of deporta-

tion); *Catholic Soc. Servs., Inc. v. INS, 232 F.3d 1139, 1149-50 (9th Cir. 2000)* (en banc) (rejecting claim that statute deprived the district court of jurisdiction to enter a preliminary injunction); *Barapind v. Reno, 225 F.3d 1100, 1109-10 (9th Cir. 2000)* (holding that statute does not preclude jurisdiction over habeas petition for stay of asylum [**27] proceedings).

Most recently, we held that the consideration of a purely legal question, which does not challenge the Attorney General's discretionary authority, supports jurisdiction. *Ali v. Ashcroft, 346 F.3d 873, 878-79 (9th Cir. 2003).* Although that holding arose in the context of a habeas petition, while this one does not, the same principle applies here. The district court may consider a purely legal question that does not challenge the Attorney General's discretionary authority, even if the answer to that legal question -- a description of the relevant law -- forms the backdrop against which the Attorney General later will exercise discretionary authority. *Cf. Spencer Enters., Inc. v. United States, 345 F.3d 683,* [*1156] *689-90 (9th Cir. 2003)* (holding that the jurisdictional bar in *§ 1252(a)(2)(B)(ii)* applies only to acts over which a statute gives the Attorney General pure discretion unguided by legal standards or statutory guidelines).

#### 2. *Merits*

The injunction issued by the district court required that the law as it existed in 1985 apply to all subsequent proceedings and sought to implement the sealing order. [5] With respect to the first point, [**28] we hold that the statute is not impermissibly retroactive, so the post-1985 law properly applies. The second point will be considered in the next section of this opinion.

> 5    The sealing order is quoted at p. 2602-03, above.

We review a district court's decision to issue a permanent injunction for abuse of discretion, but we review any determination underlying the court's decision by the standard that applies to that determination. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814, 826 (9th Cir. 2001).* Whether a statute may be applied retroactively is an issue of law that we review de novo. *Chenault v. United States Postal Serv., 37 F.3d 535, 537 (9th Cir. 1994).* Therefore, we review de novo the district court's injunction barring the INS from retroactively applying later immigration statutes to Hovsepian.

To determine whether *8 U.S.C. § 1227* is impermissibly retroactive, we must examine the statute under the two-part analysis of [**29] *Landgraf v. USI Film Products, 511 U.S. 244, 128 L. Ed. 2d 229, 114 S. Ct. 1483 (1994). See INS v. St. Cyr, 533 U.S. 289, 315-24, 150 L.*

Ed. 2d 347, 121 S. Ct. 2271 (2001) (applying *Landgraf* to Congress' retroactive amendment of the INA). The first step of the retroactivity analysis requires us "'to ascertain whether Congress has directed with the requisite clarity that the law be applied retrospectively.'" *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 601 (9th Cir. 2002) (quoting *St. Cyr*, 533 U.S. at 316). The statute must be "so clear that it could sustain only one interpretation." *Id.* (internal quotation marks omitted). Only if the statute does not contain an "'express command'" describing its "'proper reach'" do we proceed to step two of the analysis, which is to determine whether application of the statute would have a retroactive effect within the meaning of *Landgraf. Id.* (quoting *Landgraf, 511 U.S. at 280*). A retroactive effect is one that "'would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" [**30] *Id.* (quoting *Landgraf, 511 U.S. at 280*). A statute that has such a retroactive effect cannot be applied to the litigant before the court. *Id.*

*Section 1227* satisfies the first step of the *St. Cyr* analysis because "Congress has directed with the requisite clarity that the law be applied retrospectively." *St. Cyr, 533 U.S. at 316*. Section 602(c) of the 1990 amendments, which added possession of a destructive device to the list of deportable offenses, provided that the amendments should apply even if an alien's conviction "occurred before the date of the enactment of this Act." Pub. L. No. 101-649, § 602(c), 104 Stat. 4978, 5081-82 (1990).

Thus, unlike in *St. Cyr*, we can presume that "Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." *533 U.S. at 320* (internal quotation marks omitted). There is, therefore, no need to proceed to the second step of the *Landgraf* [*1157] analysis. *See Landgraf, 511 U.S. at 264, 266; Magana-Pizano v. INS, 200 F.3d 603, 612 (9th Cir. 1999).* [**31]

The fact that Congress did not elaborate on the intended effect of *§ 1227*'s retroactivity on a pre-existing JRAD does not alter this analysis. Congress was certainly aware that, by creating new deportable offenses and making them retroactive, it was altering the statute to make previously non-deportable persons subject to deportation. Congress has the power to create such a retroactive effect. *See St. Cyr, 533 U.S. at 316.* [6] In fact, Congress specifically provided for the elimination of JRADs in the same statutory enactment in which it retroactively made possession of a destructive device a deportable offense. Pub. L. No. 101-649, § 505, 104 Stat. 4978 (1990). Congress thus consciously took from courts the power to prohibit the executive branch from deport-

ing particular aliens. It is therefore unavailing to argue, as Hovsepian does, that Congress might not have considered the fact that the 1990 amendments would render deportable some aliens who previously had been nondeportable by virtue of a JRAD.

6  Even were this not the case, Hovsepian is not similarly situated to the petitioner in *St. Cyr* because he did not plead guilty but, instead, was convicted after a trial. Thus, Hovsepian did not waive any constitutional rights in reliance on the possibility of favorable immigration consequences, nor did he enter into a quid pro quo relationship with the INS that was unsettled by the retroactive application of *8 U.S.C. § 1251(a)(2)(C). St. Cyr, 533 U.S. at 321-23; Armendariz-Montoya v. Sonchik, 291 F.3d 1116, 1121 (9th Cir. 2002), cert. denied, 539 U.S. 902, 156 L. Ed. 2d 110, 123 S. Ct. 2247 (2003); Jimenez-Angeles v. Ashcroft, 291 F.3d 594, 600-02 (9th Cir. 2002).*

[**32] Accordingly, the district court erred in entering an injunction barring the INS from deporting Hovsepian on any ground not in existence at the time of his original sentencing. [7] We leave the injunction in place, however, pending the conclusion of all proceedings in this case, in aid of the court's jurisdiction. *See, e.g., Gerling Global Reins. Corp. v. Low, 240 F.3d 739, 754 (9th Cir. 2001)* (holding that the district court erred by granting a preliminary injunction, but leaving the injunction in place so that, on remand, the district court could consider whether an alternative ground supported the injunction), *amended by 296 F.3d 832 (9th Cir. 2002), reversed on other grounds by Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 156 L. Ed. 2d 376, 123 S. Ct. 2374 (2003); Hilo v. Exxon Corp., 997 F.2d 641, 647 (9th Cir. 1993)* (concluding that the district court erred by denying preliminary injunctive relief and ordering the district court to make further findings of fact and determine whether a preliminary injunction should issue, but leaving its own preliminary injunction in place pending the district court's ruling).

7  Hovsepian asserts that the INS should be equitably estopped from deporting him on the basis of changes made to the immigration laws. He claims that, during his sentencing, INS counsel stated that the JRAD would effectively bar the INS from deporting Hovsepian on account of his conviction. However, the INS's statement was an accurate description of the state of the law at that time and does not rise to the level of "affirmative misconduct." *See Wenger v. Monroe, 282 F.3d 1068, 1076 (9th Cir. 2002)* (holding that, in order for estoppel to be applied to the government, the

359 F.3d 1144, *; 2004 U.S. App. LEXIS 3959, **;
13 A.L.R. Fed. 2d 845

government must have engaged in "affirmative misconduct going beyond mere negligence").

[**33] We turn next to the sealing order, which the injunction sought to implement.

D. *The Order Sealing Yacoubian's Conviction Records*

After resentencing Hovsepian and Yacoubian under FYCA, the district court sealed the records of their convictions. The court ordered the FBI to physically remove the conviction records from its files and to place those records in a "sepa [*1158] rate storage facility which is not to be opened other than in the course of a bona fide criminal investigation by law enforcement, and only where necessary for such an investigation." Further, the court ordered that, "except for a bona fide criminal investigation, no governmental agency or official, including the INS, may use, directly or indirectly, any information or materials relating to, or derived from, the records and documents that were the subject of this case." In addition, the court ordered that "Viken Yacoubian and Viken Hovsepian may, and all others must, consider, for all purposes, the aforesaid conviction as expunged and as never having occurred."

We review de novo whether a district court has the authority to order expungement of a record or conviction. *United States v. Sumner, 226 F.3d 1005, 1009 (9th Cir. 2000).* [**34]

Because the district court erred in resentencing Hovsepian under FYCA, it also necessarily erred in setting aside his conviction and sealing his conviction records pursuant to FYCA. Nonetheless, because the INS did not challenge the district court's resentencing of Yacoubian, we must address whether the court properly sealed the records of his conviction under FYCA. [8] We conclude that the district court's sealing order is excessively broad.

8 Yacoubian argued in the alternative that the district court had authority to expunge his conviction records as part of the court's "inherent authority." We squarely rejected such an argument in *Sumner, 226 F.3d at 1010,* and do not wish to revisit that issue here.

The district court held that the INS could not "use, directly or indirectly, any information or materials relating to, or derived from, the records and documents that were the subject of this case." We believe, however, that information relating to expunged convictions can be used in the immigration [**35] context.

In order to obtain the privilege of naturalization, an applicant affirmatively must establish good moral character. *8 U.S.C. § 1427(a)(3); 8 C.F.R. § 316.2(b).*

Whether or not a person is convicted of a crime, the underlying acts that resulted in a conviction bear on the person's character. The fact that an alien's conviction was expunged does not mean that the alien did not commit the crime or engage in behavior calling into question his or her good character. A person who was convicted, but whose conviction was expunged or set aside, should be in no better position than a person who committed the identical acts but escaped detection and prosecution.

Other circuits agree, [9] holding that expunged convictions can be used in assessing an alien's "good moral character." [10] For example, the Eighth Circuit has explained [*1159] that "an Immigration Judge may consider expunged convictions in making a moral character determination." *Ikenokwalu-White v. INS, 316 F.3d 798, 804 (8th Cir. 2003).* Similarly, the Eleventh Circuit has held that extrinsic evidence underlying a conviction that had been expunged under FYCA can render [**36] a petitioner "statutorily ineligible for voluntary departure as a person lacking in good moral character." *Castano v. INS, 956 F.2d 236, 237 n.2 (11th Cir. 1992).*

9 Our own cases interpreting FYCA's set-aside provision outside the immigration context are not directly relevant to the inquiry in the immigration context. *See, e.g., United States v. Campbell, 724 F.2d 812 (9th Cir. 1984)* (holding that a set-aside conviction could be considered when sentencing a FYCA offender for a later crime and noting that FYCA set-aside does not affect nonpublic records kept by the Department of Justice); *Fite v. Retail Credit Co., 537 F.2d 384 (9th Cir. 1976)* (upholding a refusal to enjoin a credit agency's dissemination of the facts of a defendant's set-aside FYCA conviction because a set-aside conviction under FYCA does not disappear); *see also United States v. Kammerdiener, 945 F.2d 300 (9th Cir. 1991)* (holding that, under the sentencing guidelines, a conviction set aside under FYCA cannot be considered in calculating criminal history category); *United States v. Hidalgo, 932 F.2d 805 (9th Cir. 1991)* (relying on FYCA by analogy when considering the effect of a conviction expunged pursuant to a California statute and holding that "set aside" means "expunged" under FYCA).

[**37]
10 These cases typically arise in the context of the Attorney General's discretionary authority to suspend deportation or to allow voluntary departure. A statutory prerequisite for both types of relief is that the applicant demonstrate "good moral character."

359 F.3d 1144, *; 2004 U.S. App. LEXIS 3959, **;
13 A.L.R. Fed. 2d 845

We, too, believe that the facts underlying expunged convictions are relevant in the context of "good moral character" determinations. [11] We already have held above that expungement or set-aside under FYCA does not make the records of the crimes disappear; a fortiori the conduct in which the applicant engaged does not disappear. As the Eleventh Circuit has noted:

> Because expunction does not entitle its recipient to the concealment of a conviction, neither does it conceal the facts underlying a conviction. Expunction means that *the conviction itself* will not stand as an impediment to a youthful offender in the future. We conclude that expunction does not entitle petitioner to secret the fact of his conviction, or the facts underlying that conviction, from immigration officials.

*Castano, 956 F.2d at 239.* [**38] Similarly, we hold that, even if a conviction is set aside under FYCA, the facts underlying that conviction remain relevant in determining whether an applicant for naturalization can satisfy the requirement that he or she is of "good moral character."

> 11   In *Ramirez-Castro v. INS, 287 F.3d 1172, 1173 (9th Cir. 2002)*, we held that the expungement of a state conviction could not eliminate the immigration consequences of that conviction, namely, deportation on the basis of the conviction itself. We further held that an expunged conviction is not nullified for purposes of the immigration laws unless it falls within the narrow exception established for cases involving first-time simple possession of narcotics. *Id. at 1174*. However, we are not called on here to decide whether a conviction that was expunged under FYCA may be used per se to disqualify an applicant for naturalization. Instead, we address only the extent to which the facts underlying a set-aside conviction can be used.

[**39] Accordingly, the district court's sealing order was overbroad because it prohibited the INS from considering the facts underlying Yacoubian's FYCA conviction as evidence that he was not a person of "good moral character." We vacate that order.

E. *Naturalization Proceedings*

Relying on *8 U.S.C. § 1447(b)*, the district court exercised exclusive jurisdiction over Appellees' naturalization applications even after the INS had purportedly denied them. Further, the district court continued to evalu-

ate the applications despite the fact that the INS had expressed an intention to deport Appellees. Finally, the district court granted Appellees' naturalization applications but refused to consider their convictions or the facts underlying those convictions. We turn now to each of those aspects of the court's decision.

1. *Jurisdiction*

Based on the text of *§ 1447(b)*, the context of related statutory provisions, and Congress' policy objectives, we hold that the district court had exclusive jurisdiction over Appellees' naturalization applications.

(a) *Statutory Text*

We begin our analysis of the jurisdictional issue by looking to the text of *8 U.S.C. § 1447(b)*, [**40] [12] which provides:

> [*1160] If there is a failure to make a determination under section 1446 of this title before the end of the 120-day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

> 12   When interpreting a federal statute, we first examine the statutory text. *United States v. Buckland, 289 F.3d 558, 564 (9th Cir. 2002)* (en banc).

The INS concedes that, when a naturalization applicant makes a timely request for a hearing on his or her application, the district court has jurisdiction over the naturalization matter pursuant to *§ 1447(b)*. However, the INS further asserts that the statute does not give the district court *exclusive* jurisdiction [**41] to decide the matter once the court acquires jurisdiction but, instead, creates only *concurrent* jurisdiction. Thus, it claims that the INS retains the power to grant or deny a naturalization application even after the district court has assumed jurisdiction over it.

The INS's interpretation is inconsistent with the remaining text of *§ 1447(b)*, which states that, once a dis-

trict court has jurisdiction over the matter, the court "may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter."

That phrasing bestows on the district court the power to pursue either of two options. The first option is to "determine the matter." How can the court "determine the matter" if the INS has the option to "determine the matter," too, and essentially force the court to accept its view? If Congress had intended for the INS to retain power to make a naturalization decision even after the district court acquires jurisdiction, why would the statute expressly give the district court the option to *decide* the matter? This wording shows that Congress intended to vest power to decide languishing naturalization applications in the district [**42] court *alone, unless* the court chooses to "remand the matter" to the INS, with *the court's* instructions.

That brings us to the second statutory option. *Section 1447(b)* allows the district court, in lieu of the first option of "determining the matter," to "remand the matter" with instructions that, presumably, the INS is required to heed. Why would Congress need to provide for a "remand" to the INS "to determine the matter" if the INS retained jurisdiction "to determine the matter" all along?

When we "remand" a case to the district court, for example, we do so because the district court has lost jurisdiction once we acquire it upon the filing of a proper notice of appeal. *Stein v. Wood, 127 F.3d 1187, 1189 (9th Cir. 1997)*. The most natural reading of the statute is that Congress used the term "remand" in the same sense.

Moreover, Congress empowered the district court to remand the matter to the INS with *the court's* instructions. The INS's proposed scheme would, in essence, reverse that hierarchy by allowing the INS to dictate, or at least severely limit, the conditions of remand.

Additionally, the statute provides that the district court may remand [**43] the matter, with instructions, "to the Service to determine the matter." If the INS already had the power "to determine the matter" in the meantime, this phrase would be surplusage. We interpret statutes so as to avoid making any phrase meaningless or unnecessary. *N.W. Forest Res. Council v. Glickman, 82 F.3d 825, 834 (9th Cir. 1996)*.

By providing that the court may "remand the matter, with appropriate instructions, to the Service to determine the matter," *§ 1447(b)* allows the district court to order the INS to adopt the court's fact-finding [*1161] and conclusions, a hierarchical result that is more consistent with exclusive jurisdiction than with concurrent jurisdiction.

Our statutory analysis is consistent with *Brock v. Pierce County, 476 U.S. 253, 90 L. Ed. 2d 248, 106 S. Ct. 1834 (1986)*. *Brock* held that an agency does not lose jurisdiction unless the statute at issue requires that the agency act within a particular time period *and* the statute specifies a consequence for failure to comply with the time limit. *Id. at 259, 266; see also Intercontinental Travel Mktg., Inc. v. FDIC, 45 F.3d 1278, 1284-85 (9th Cir. 1994)* (applying [**44] *Brock*). Here, *8 U.S.C. § 1447(b)* requires the INS to make a decision regarding a naturalization application within 120 days of the applicant's initial interview of the applicant. Further, *§ 1447(b)* specifies a consequence for failure to meet this deadline, namely, that the district court gains jurisdiction over the matter (upon the applicant's request) until the district court decides the case or exercises its discretion to remand the matter to the INS. Under *Brock*, therefore, *§ 1447(b)* is an effective jurisdiction-stripping statute. *See Friends of Crystal River v. EPA, 35 F.3d 1073, 1075 n.3, 1080 (6th Cir. 1994)* (holding that a similar statute divested the EPA of jurisdiction and gave exclusive jurisdiction instead to the Army Corps of Engineers).

*Sze v. INS, 153 F.3d 1005 (9th Cir. 1998)*, is distinguishable. The complaint in *Sze* did not ask the district court to decide the applicants' naturalization petitions. Instead, the plaintiffs had brought a test case urging the court to declare that the INS had violated the statute and regulations by failing to make determinations within 120 days of their examinations and, [**45] upon that declaration, to issue a writ of mandamus requiring *the INS* to act faster on applications. *Id. at 1007*. Because the whole premise of the litigation was to ask the court to force the INS to act, and because the plaintiffs never asked the district court itself to review the naturalization applications de novo, the court had no occasion to examine whether it, in the alternative, could act. And, because the requested relief was INS action and the INS had acted definitively in the plaintiffs' favor by the time the case reached us (the applicants had become citizens), mootness was the only possible conclusion we could draw. We therefore dismissed the appeal for lack of Article III jurisdiction. *Id. at 1010*. *Sze* did not make any substantive holding concerning the naturalization procedures that we expressly did not consider. [13]

13 To the extent that anything said in *Sze* is inconsistent with our en banc decision today, this en banc case will govern.

In short, [**46] the INS's proposed interpretation of *§ 1447(b)* cannot be squared with the text of the statute and, accordingly, must be rejected. *See FDIC v. County of Orange (In re County of Orange), 262 F.3d 1014, 1018 (9th Cir. 2001)* ("In construing a statute, we first consider its text. When the statute's language is

plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms." (internal quotation marks omitted)).

(b) *Statutory Context*

In addition to being inconsistent with the text of § 1447(b) itself, the INS's interpretation makes little sense in the light of the statute's context. [14] Another statutory provision defines the district court's role in reviewing INS naturalization decisions. It states:

> [*1162] A person whose application for naturalization under this subchapter is denied, after a hearing before an immigration officer under section 1447(a) of this Title, may seek review of such denial before the United States district court for the district in which such person resides in accordance with chapter 7 of Title 5. Such review shall be de novo, and the court shall make its [**47] own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.

*8 U.S.C. § 1421(c).*

14    In interpreting a statute, we consider Congress' words in the context of the overall statutory scheme. *A-Z Int'l v. Phillips, 323 F.3d 1141, 1147 (9th Cir. 2003).*

That statutory provision allows unsuccessful naturalization applicants to ask the district court to review the INS's denial of their applications. [15] Upon request, the district court must undertake a full de novo review of the INS's denial. The court may not rely on the INS's findings of fact or law and, on request, must hold its own hearing on the naturalization application. Accordingly, *even if the INS is allowed to make the initial decision on a naturalization application, the district court has the final word* and does not defer to any of the INS's findings or conclusions.

15    Unsuccessful applicants must first take an administrative appeal of the denial and complete the INS's administrative process before seeking judicial review. *8 U.S.C. § 1421(c), (d); 8 U.S.C. § 1447(a); 8 C.F.R. § 336.2.*

[**48] Because § 1421(c) requires the district court to undertake the *same* analysis that it must make under § 1447(b), it makes sense to interpret the latter statutory provision as giving district courts the last word, too. Under § 1421(c), the district court has the last word with respect to denied applications, by conducting its own hearing and reviewing the application de novo. Under § 1447(b), the court has the last word by exercising exclusive jurisdiction over those naturalization applications on which the INS has failed to act in a timely fashion. It is illogical to hold, as the INS urges us to, that § 1447(b) gives district courts jurisdiction to decide naturalization applications but, at the same time, allows the INS to truncate the courts' decision-making process by making factual findings and drawing conclusions about the applications, because reviewing courts may not defer to those findings and conclusions.

In the light of § 1421(c), therefore, § 1447(b) is best viewed as a mechanism by which naturalization applicants who are impatient with INS delay may skip the agency's analysis of their application and proceed directly to the step in which the district court conducts [**49] a de novo review of the application. In other words, under our reading of the statutory text and context, the district court has the final word concerning denial of a naturalization application in one of two ways: either the INS fails to act in a timely manner, in which case the applicant may obtain a hearing and de novo proceeding in district court; [16] [*1163] or the INS acts unfavorably, in which case the applicant may obtain a hearing and de novo review in district court.

16    The INS argues that the district court erred in conducting a de novo hearing on the applications. It argues that, instead, "the district court steps into the role of the INS officer and proceeds to determine whether the application should be granted or denied based on the content of the application and the evidence presented to the INS during its examination of the applicant." This argument is unpersuasive for three reasons.

First, forcing the district court to limit its investigation to only those questions asked by the INS hearing examiner would limit the court's ability to exercise its jurisdiction. The district court would be forced to deny an application any time the INS officer failed to ask a question regarding an important ground for naturalization or chose to investigate further an applicant's incomplete answer in a later interview. Such an interpretation would give the INS power to force the district court's hand even if the INS delayed more than 120 days in making a decision on an application.

Second, INS examining officers have power to question applicants, call witnesses, issue subpoenas, and receive documentary or written evidence. *See 8 C.F.R. § 335.2.* Thus, if "the district

court steps into the role of the INS officer," as the INS argues, then, pursuant to this regulation, the district court has the power to undertake what amounts to a de novo hearing.

Finally, under *8 U.S.C. § 1421(c)*, the district court is *required* to hold a de novo hearing after the INS denies an application. The district court's naturalization decisions under both *§ 1447(b)* and *§ 1421(c)* are final, so the district court's powers of investigation should be the same under each statutory provision. It makes little sense to require the district court to undertake a de novo inquiry after the INS has made a full investigation and arrived at a reasoned decision, but to bar a de novo hearing when the INS has not issued a decision and likely has not concluded its investigation.

For these reasons, we hold that the district court had power to conduct a de novo hearing on Appellees' naturalization applications.

[**50] Under a scheme of concurrent jurisdiction, an applicant who has received no answer from the INS could go to court under *§ 1447(b)*. In the meantime, however, the INS could decide the matter against the applicant. But the applicant then would have the option to appeal the INS's denial under *§ 1421(c)*, and the district court would have de novo review. We do not believe that Congress intended such a judicially uneconomical procedure.

**(c) Congress' Policy Objectives**

Finally, acceptance of the INS's interpretation of *8 U.S.C. § 1447(b)* would undermine four main public policy objectives that Congress sought to further [17] by enacting the *Immigration Act of 1990*.

> 17    When interpreting statutes, courts look to congressional intent revealed in the history and purposes of the statutory scheme. *Buckland, 289 F.3d at 565*.

A central purpose of the statute was to reduce the waiting time for naturalization applicants. *See* H.R. Rep. No. 101-187, at 8 (1989); 135 Cong. Rec. [**51] H4539-02, H4542 (1989) (statement of Rep. Morrison). This purpose of *§ 1447(b)* will be frustrated if district courts are required to share concurrent jurisdiction with the INS. The INS will no longer have much incentive to act on a naturalization application within the 120-day period. That is so because the INS will retain jurisdiction even when an applicant requests a hearing from the district court until the district court grants or denies the application, which takes significant additional time even in the most current of districts. Thus, allowing the INS to

retain jurisdiction over a naturalization application even after the INS fails to act will frustrate Congress' intent to require the INS to make a determination within 120 days of an applicant's examination.

Further, in enacting the statute Congress intended to streamline the process of applying for naturalization and intended to reduce the burdens on courts and the INS. *See* H.R. Rep. No. 101-187, at 8; 135 Cong. Rec. H4539-02, H4543 (statement of Rep. Smith). If we were to accept the INS's reading of *§ 1447(b)*, the resulting procedure would lead to a waste of time and resources because district courts and the INS would [**52] often engage in unnecessary duplication of factual investigations and legal analyses. In cases in which the INS eventually denied an application, the district court would be required to dismiss or stay an applicant's *§ 1447(b)* action, wait for the applicant to exhaust administrative remedies and, if the applicant requested it, engage in a de novo review of the INS's decision and hold another hearing under *§ 1421(c)*. Further, should the applicant [*1164] change the district of his or her residence, the court hearing the *§ 1421(c)* appeal probably would not be the same one that oversaw the *§ 1447(b)* proceedings. *See 8 U.S.C. § 1421(c)* (stating that the applicant "may seek review of such denial before the United States district court for the district in which such person resides"); *id. § 1447(b)* (stating that "the applicant may apply to the United States district court for the district in which the applicant resides for a hearing"). The district courts and the INS are both overburdened with other pressing matters, and giving them concurrent jurisdiction over delayed naturalization applications frustrates Congress' intent to reduce the burdens on the INS and [**53] the district courts.

Third, representatives drafting the statute were concerned with the consistency and fairness of naturalization decisions. *See* H.R. Rep. No. 101-187, at 12-13. Acceptance of the INS's reading of the statute could exacerbate these problems. Were we to give the INS and district courts concurrent jurisdiction over naturalization applications, this would sometimes result in a race to decide a given case. When, as here, the INS and the district court disagree as to the merits of a naturalization application, the first to decide would prevail. Thus, concurrent jurisdiction might cause a rushed decision-making process and might increase the possibility that mistakes will be made. Further, participants would likely question the legitimacy of a process in which they may gain or lose something so important as citizenship simply because one entity rushes to issue a decision before the other. By contrast, under our reading of *§ 1447(b)*, the goal of consistency is furthered; Congress gave the last word to the district courts for delayed *or* denied applications.

Finally, the sponsors of the legislation intended to give naturalization applicants the power to choose which [**54] forum would adjudicate their applications. As the representative who introduced the proposed statute on the House floor noted, "in this legislation, *it is the applicant, not the government*, who decides the place and the setting and the timeframe in which the application will be processed." 135 Cong. Rec. H4539-02, H4542 (statement of Rep. Morrison) (emphasis added). Allowing the INS to continue to exercise jurisdiction over an application even after the naturalization applicant has elected to have the district court decide the application would frustrate the sponsors' intent.

### (d) Conclusion

Section 1447(b) allows the district court to obtain exclusive jurisdiction over those naturalization applications on which the INS fails to act within 120 days if the applicant properly invokes the court's authority. Thus, we hold that the district court did not err in retaining jurisdiction over Appellees' applications even after the INS had denied them.

### 2. Effect of the INS's Efforts to Remove Hovsepian and Yacoubian

Although we hold that *§ 1447(b)* gave the district court exclusive jurisdiction over Appellees' naturalization applications, there is yet another potential barrier [**55] to the district court's consideration of those applications. Title *8 U.S.C. § 1429* provides that "no application for naturalization shall be considered by the Attorney General if there is pending against the applicant a removal proceeding pursuant to a warrant of arrest." Because the INS was seeking to remove Appellees from the United States when they filed their naturalization applications, we must consider whether *§ 1429* barred the district court from granting their applications.

As discussed above, the INS filed its *Rule 36* motion to correct clerical errors in [*1165] the judgments and commitment orders in order to facilitate Appellees' removal. In addition, the district director of the INS signed formal charging documents for removal proceedings and arrest warrants naming Appellees.

These facts might lead one to conclude that there were "removal proceedings pursuant to a warrant of arrest" "pending against" Hovsepian and Yacoubian. However, a removal proceeding does not "commence" against an alien until the INS actually files a Notice to Appear with the immigration court. *Jimenez-Angeles, 291 F.3d at 600*. The INS never filed any charging documents [**56] in this case and, therefore, removal proceedings against Appellees never commenced. Because, logically, a removal proceeding cannot be "pending" before it has

"commenced," *§ 1429* does not have any application in the circumstances of this case.

The INS argues that the only reason why it did not file Notices to Appear with the immigration court was that it was waiting for the district court to grant its *Rule 36* motion. The INS claims that, as soon as the errors in Appellees' judgments and commitment orders were corrected, it would commence removal proceedings against Appellees. The INS's intentions are irrelevant, however. Regardless of the reasons for failing to file the charging papers, [18] the fact remains that no removal proceedings were "pending" against Hovsepian or Yacoubian when the district court naturalized them. Thus, *§ 1429* did not bar the district court from considering their naturalization applications.

> 18    The INS did not have to wait for a ruling on the *Rule 36* motion but, instead, could have brought removal proceedings even in the absence of a correction of the criminal judgments and commitment orders. One ground for deportation listed in the INS charging documents was that Appellees had engaged in "terrorist activity." This ground could have been proved even in the absence of any conviction, corrected or otherwise.

### [**57] 3. Merits of the District Court's Naturalization Decision

The INS argues that, even if the district court did not err in exercising jurisdiction over Appellees' naturalization applications, the court nonetheless erred in granting the applications. It is to that issue that we now turn.

We analyze the merits of the court's naturalization decision under our usual standard of review. Thus, we review for clear error the district court's findings of fact, *Freeman v. Allstate Life Ins. Co., 253 F.3d 533, 536 (9th Cir. 2001)*, including findings pertaining to good moral character, *Yuen Jung v. Barber, 184 F.2d 491, 497 (9th Cir. 1950)*. We review de novo the district court's conclusions of law. *United States v. Carranza, 289 F.3d 634, 643 (9th Cir. 2002)*.

Title *8 U.S.C. § 1427* sets forth a number of requirements that a naturalization applicant must meet. Among them is the requirement that an applicant, "during the five years immediately preceding the date of filing his application[,] . . . has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, [**58] and well disposed to the good order and happiness of the United States." *8 U.S.C. § 1427(a)(3)*. In addition to meeting that requirement, a naturalization applicant must show that, during the 10 years preceding the filing of the appli-

cation, the applicant was not affiliated with any of the groups enumerated in *8 U.S.C. § 1424(a)*, including terrorist groups. *8 U.S.C. § 1424(a), (a)(4)*.

The district court concluded that Hovsepian and Yacoubian met those requirements. [*1166] In arriving at that conclusion, however, the district court did not consider Appellees' convictions because it had ruled that those convictions were expunged and that the records of those convictions were sealed.

As we have held, however, the district court erred in resentencing Hovsepian under FYCA and, therefore, had no power to seal the records of his conviction. Further, as discussed above, the district court's order sealing the records of Yacoubian's conviction was too broad. Accordingly, the district court erred by failing to consider the facts underlying Appellees' convictions when it made its decision regarding good moral character. We therefore [**59] must decide whether, considering all the relevant evidence, the district court's determination of good moral character must be reversed.

The term "good moral character" is not defined in the INA. However, *8 U.S.C. § 1101(f)* sets forth a list of characteristics that, if present in a naturalization applicant, preclude a finding of good moral character. The statute provides that "no person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character . . . is, or was . . . one who at any time has been convicted of an aggravated felony." *8 U.S.C. § 1101(f)(8)*.

The crimes of which Appellees were convicted are aggravated felonies. *See 8 U.S.C. § 1101(a)(43)(E)* (providing that crimes involving firearms and explosive materials are aggravated felonies). However, the district court did not err by failing to deny Appellees' naturalization applications on this ground. Hovsepian and Yacoubian were convicted of their crimes in 1984, and Congress explicitly limited the reach of *§ 1101(f)(8)* to conduct occurring after November 29, 1990, the effective date of the [**60] statute. Pub. L. No. 101-649, § 509, 104 Stat. 4978 (1990).

Similarly, Appellees' naturalization is not barred by *8 U.S.C. § 1101(f)(7)*, which precludes a finding of good moral character with respect to one

> who, during the period for which good moral character is required to be established, is, or was--
>
> . . . .
>
> (7) one who during such period has been confined, as a result of conviction, to a penal institution for an aggregate period of one hundred and eighty days or more,

> regardless of whether the offense, or offenses, for which he has been confined were committed within or without such period[.]

Although both Hovsepian and Yacoubian were incarcerated for more than 180 days as a result of their convictions, neither was confined during the "period for which good moral character is required to be established," namely, the five years preceding the filing of their naturalization applications. *See 8 U.S.C. § 1427(a)*.

However, the fact that Appellees' convictions are not an *automatic* bar to a finding of good moral character does not mean that they are irrelevant to the moral character inquiry. To the contrary, *8 U.S.C. § 1427(e)* [**61] provides that,

> in determining whether the applicant has sustained the burden of establishing good moral character and the other qualifications for citizenship specified in subsection (a) of this chapter, the Attorney General shall not be limited to the applicant's conduct during the years preceding the filing of the application, but may take into consideration as a basis for such determination the applicant's conduct and acts at any time prior to that period.

Similarly, *8 C.F.R. § 316.10(a)(2)* provides:

> The Service is not limited to reviewing the applicant's conduct during the five years immediately preceding the filing [*1167] of the application, but may take into consideration, as a basis for its determination, the applicant's conduct and acts at any time prior to that period, if the conduct of the applicant during the statutory period does not reflect that there has been reform of character from an earlier period or if the earlier conduct and acts appear relevant to a determination of the applicant's present moral character.

Further, this court has held that convictions from outside the regulatory time period may be considered [**62] when determining whether a naturalization applicant is, or has been, a person of good moral character. *See Santamaria-Ames v. INS, 104 F.3d 1127, 1132 (9th Cir. 1996)* (noting that convictions from the pre-regulatory

359 F.3d 1144, *; 2004 U.S. App. LEXIS 3959, **;
13 A.L.R. Fed. 2d 845

We reject the INS's argument for the same reason that we reject Appellees' waiver argument. As discussed above, the district court's sealing order had an extremely broad scope. Because of it, Appellees had good reason to believe that the sealing order prohibited the INS from [**67] making any inquiries about the convictions or any of the circumstances underlying them. Their refusal to answer questions that they believed violated the sealing order was reasonable at the time and should not necessarily serve as grounds for denying their naturalization applications. Thus, we decline the INS's invitation to deny Appellees' naturalization applications outright, just as we reject Appellees' argument that the INS waived its right to introduce evidence of Appellees' convictions and possible affiliations with terrorist groups.

Instead, we remand this case to the district court for further proceedings limited to reconsideration of Appellees' eligibility for naturalization. On remand, the district court shall permit the parties to introduce additional evidence relevant to the issue of good moral character and [*1169] shall reconsider Appellees' applications for naturalization accordingly.

Recognizing the "virtual certainty" that a simple remand would result in a second appeal regardless of the district court's conclusion, we retain jurisdiction hoping to "obviate the proliferation of motions and collateral proceedings" that has characterized this long and complicated case. *United States v. Hubbard, 208 U.S. App. D.C. 399, 650 F.2d 293, 296 (D.C. Cir. 1980).* [**68] Within 120 days of the issuance of the mandate, or such further time as this court may allow, the district court shall forward its additional findings of fact and conclusions of law to this court, with copies to the parties, so that we may review the district court's assessment of *all* the relevant facts in reaching a final disposition. Within 30 days after the district court forwards its findings and conclusions, any party may request this court's further review of the naturalization issue.

REVERSED and REMANDED for further proceedings consistent with this opinion.

1 of 2 DOCUMENTS

**UNITED STATES OF AMERICA, Plaintiff-Appellant, v. VIKEN YACOUBIAN, Defendant-Appellee.**

**No. 93-50322**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*24 F.3d 1; 1994 U.S. App. LEXIS 10368; 29 Fed. R. Serv. 3d (Callaghan) 331; 94 Cal. Daily Op. Service 3315; 94 Daily Journal DAR 6307*

**April 4, 1994, Argued, Submitted, Pasadena, California
May 11, 1994, Filed**

**SUBSEQUENT HISTORY:** Related proceeding at *United States v. Hovsepian, 307 F.3d 922, 2002 U.S. App. LEXIS 20668 (9th Cir. Cal., 2002)*

**PRIOR HISTORY:**    [**1] Appeal from the United States District Court for the Central District of California. D.C. No. CR-82-00917-MP(RG). Mariana R. Pfaelzer, District Judge, Presiding.
*U.S. v. Yacoubian, 857 F.2d 1480, 1988 U.S. App. LEXIS 13675 (9th Cir. Cal., 1988)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff United States appealed the United States District Court for the Central Division of California judgment that plaintiff improperly instituted deportation proceedings against defendant and enjoined plaintiff from initiating deportation proceedings against defendant based on his convictions under *18 U.S.C.S. §§ 371, 844*, and *26 U.S.C.S. § 5861(d)*.

**OVERVIEW:** Defendant, who moved to the United States at the age of 14, was convicted of charges regarding conspiracy, transportation, and possession of explosive materials under *18 U.S.C.S. §§ 371, 844* and *26 U.S.C.S. § 5861(d)*. The court in the criminal matter issued a judicial recommendation against deportation (JRAD) in accordance with *8 U.S.C.S. § 1251(b)*, which allowed district courts to recommend against deporting aliens convicted of crimes of moral turpitude. After release from prison, plaintiff United States, through its agency the Immigration and Naturalization Service attempted to deport defendant based on his convictions. Defendant sought a temporary restraining order, which the lower court granted. On appeal, the court reversed the grant because the lower court misconstrued the scope, reach, and effect of the JRAD order where Congress re-

organized *8 U.S.C.S. § 1251* to provide that aliens convicted of firearms crimes were deportable and mandated retroactive application.

**OUTCOME:** Where the statute was reorganized to provide that aliens convicted of criminal firearm activity were deportable and the statute had retroactive application, the court found that defendant could be deported after he was convicted of crimes that involved explosives. The judgment of the lower court reversed.

**LexisNexis(R) Headnotes**

*Criminal Law & Procedure > Sentencing > Alternatives > Community Service*
*Criminal Law & Procedure > Sentencing > Deportation & Removal*
*Immigration Law > Deportation & Removal > Relief > Postconviction Remedies*
[HN1] *8 U.S.C.S. § 1251(b)* allows district courts to recommend against deporting an alien convicted of a crime of moral turpitude.

*Civil Procedure > Remedies > Injunctions > Permanent Injunctions*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN2] A court reviews issues of law like jurisdiction, separation of powers, ex post facto and double jeopardy claims de novo. A court's grant of permanent injunctive relief is reviewed for an abuse of discretion or application of erroneous legal principles.

EXHIBIT 3

24 F.3d 1, *; 1994 U.S. App. LEXIS 10368, **;
29 Fed. R. Serv. 3d (Callaghan) 331; 94 Cal. Daily Op. Service 3315

*Immigration Law > Constitutional Foundations > Statutory Application & Interpretation*
*Immigration Law > Deportation & Removal > Relief > Postconviction Remedies*
[HN3] Deportation, while it may be burdensome and severe for the alien, is not a criminal punishment.

*Civil Procedure > Judgments > Entry of Judgments > Enforcement & Execution > General Overview*
*Criminal Law & Procedure > Appeals > Reviewability > General Overview*
[HN4] A judgment or decree of a court, if appealable, is, after no appeal is taken, conclusive upon the parties.

*Administrative Law > Judicial Review > Reviewability > Exhaustion of Remedies*
*Civil Procedure > Justiciability > Exhaustion of Remedies > Administrative Remedies*
*Immigration Law > Judicial Review > Exhaustion of Remedies*
[HN5] 8 U.S.C.S. § 1105a(c) provides that an order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations. Nothing in that provision removes the power of a court to enforce its own properly issued orders. There is no question that courts have inherent power to enforce compliance with their lawful order.

*Criminal Law & Procedure > Criminal Offenses > Weapons > Possession > Elements*
*Immigration Law > Deportation & Removal > Grounds > Criminal Activity > General Overview*
[HN6] See 8 U.S.C.S. § 1251(a)(2)(C).

*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > General Overview*
*Criminal Law & Procedure > Sentencing > Deportation & Removal*
*Governments > Legislation > Effect & Operation > Retrospective Operation*
[HN7] Congress may enact legislation with retroactive effect so long as it comports with due process by passing constitutional muster under rational basis scrutiny.

*Constitutional Law > Substantive Due Process > Scope of Protection*

*Immigration Law > Deportation & Removal > Grounds > Criminal Activity > Moral Turpitude*
*Immigration Law > Deportation & Removal > Relief > Postconviction Remedies*
[HN8] While retroactive legislation does have to meet a burden not faced by legislation that has only future effects, that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.

*Constitutional Law > Substantive Due Process > Scope of Protection*
*Constitutional Law > Equal Protection > Scope of Protection*
*Criminal Law & Procedure > Sentencing > Deportation & Removal*
[HN9] 8 U.S.C.S. § 1251(a)(2)(C) survives the rational basis scrutiny because its means retroactive application of the firearm, destructive device, conviction deportation provision is rationally related to a legitimate governmental purpose. It results in uniform application of the deportation provision to aliens convicted of firearm offenses, no matter when those convictions occurred.

*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*
*Immigration Law > Deportation & Removal > Grounds > Criminal Activity > Firearms Offenses*
*Immigration Law > Deportation & Removal > Relief > Postconviction Remedies*
[HN10] Judgment is final where the availability of appeal is exhausted, and the time for a petition for certiorari has elapsed or a petition for certiorari finally has been denied.

*Constitutional Law > Congressional Duties & Powers > Ex Post Facto Clause & Bills of Attainder > Ex Post Facto Clause > Quantum of Punishment*
[HN11] The Ex Post Facto Clause of the United States Constitution prohibits the retrospective application of criminal laws that materially disadvantage the defendant. But it only applies to criminal laws.

*Constitutional Law > Congressional Duties & Powers > Ex Post Facto Clause & Bills of Attainder > General Overview*
*Immigration Law > Deportation & Removal > Relief > General Overview*
[HN12] The Supreme Court has consistently classified deportation proceedings as civil in nature and has there-

24 F.3d 1, *; 1994 U.S. App. LEXIS 10368, **;
29 Fed. R. Serv. 3d (Callaghan) 331; 94 Cal. Daily Op. Service 3315

fore determined that the Ex Post Facto Clause has no application to them.

*Constitutional Law > Congressional Duties & Powers > Ex Post Facto Clause & Bills of Attainder > Ex Post Facto Clause > General Overview*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Double Jeopardy*
[HN13] The *Double Jeopardy Clause* of the *U.S. Const. amend. V* provides that no one shall be subject for the same offence to be twice put in jeopardy of life or limb. Like the Ex Post Facto clause, this clause applies only to criminal or punitive measures successively imposed for the same criminal offense.

*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Double Jeopardy*
*Immigration Law > Constitutional Foundations > General Overview*
[HN14] Because deportation proceedings are civil and not criminal in nature, they cannot form the basis for a double jeopardy claim.

**COUNSEL:** David V. Bernal, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the plaintiff-appellant.

Peter A. Schey, Carlos Holguin, Law Offices of Schey & Holguin, Los Angeles, California, for the defendant-appellee.

**JUDGES:** Before: Cynthia Holcomb Hall, Edward Leavy, and Ferdinand F. Fernandez, Circuit Judges. Opinion by Judge Fernandez.

**OPINION BY:** FERNANDEZ

**OPINION**

    [*2] OPINION

FERNANDEZ, Circuit Judge:

At the request of Viken Yacoubian the district court found that because the Immigration & Naturalization Service instituted deportation proceedings against Yacoubian, it was in violation of the court's 1989 Judicial Recommendation Against Deportation ("JRAD") issued pursuant to *8 U.S.C. § 1251(b) (1988)*. As a consequence, the court permanently enjoined the INS from initiating deportation proceedings against Yacoubian on the basis of his convictions under *18 U.S.C. §§ 371, 844(d)* and *26 U.S.C. § 5861(d)*. The [**2] United States appealed. We determine that the district court mis-

construed the scope, reach and effect of its JRAD order, so we reverse.

*BACKGROUND FACTS*

Yacoubian was born in Beirut, Lebanon on November 9, 1962 and entered the United States on August 28, 1976 with his mother and brother. On November 3, 1982, Yacoubian, along with four co-defendants, was indicted and charged with violations of *18 U.S.C. § 371* (conspiracy to transport explosives for the purpose of injuring or intimidating a person or destroying property and conspiracy to knowingly or intentionally damage or destroy property by means of an explosive), *18 U.S.C. § 844(d)* (transportation of explosive materials) and *26 U.S.C. § 5861(d)* (possession of explosive materials). Yacoubian's indictment resulted from his participation in a plan to place an improvised explosive device containing dynamite in or near the offices of the Honorary Turkish Consul General in Philadelphia, Pennsylvania. As his part in the conspiracy he obtained a current foreign diplomatic list and transported a co-conspirator to the airport in [**3] Los Angeles, California. As he then knew, the co-conspirator was taking explosive components to the east coast for the purpose of carrying out the bombing. After a bench trial, Yacoubian was convicted on all three counts.

    [*3] Yacoubian then sought a JRAD. Yacoubian's sentencing hearing was continued several times, but before he could be sentenced the court granted his motion for new trial. The government appealed that ruling, and we reversed and remanded for sentencing. On October 30, 1989, the district court sentenced Yacoubian to three years imprisonment, one year probation and 1,000 hours of community service. The court also granted Yacoubian's request for a JRAD under former [HN1] *8 U.S.C. § 1251(b)*, which allowed district courts to recommend against deporting an alien convicted of a crime of moral turpitude. The court issued an order which provided: "It is hereby recommended that the conviction of Viken Yacoubian on October 9th, 1984, for violation of *18 U.S.C. § 371, 18 U.S.C. § 844(d)* and [*26 U.S.C. § 5861(d)*], shall not be used as a basis for [**4] deportation nor exclusion from this country."

Yacoubian began serving his sentence of incarceration on March 12, 1990 and continued to do so until December 16, 1991. In May, 1991, the INS placed a detainer on Yacoubian based on his convictions. Yacoubian presented the INS with a copy of the October, 1989 JRAD and the INS subsequently lifted the detainer. A few days after he was released from prison and entered the Gateway Community Treatment Center, Yacoubian was arrested on a new detainer issued by the INS and also based on his earlier convictions. Yacoubian sought a

24 F.3d 1, *; 1994 U.S. App. LEXIS 10368, **;
29 Fed. R. Serv. 3d (Callaghan) 331; 94 Cal. Daily Op. Service 3315

temporary restraining order. The district court granted Yacoubian's request.

On February 22, 1993, the district court held a hearing on Yacoubian's motion to enforce the JRAD. The INS argued that Yacoubian was deportable, notwithstanding the JRAD, because: (1) consistency demanded it, since one of his other co-conspirators had recently been ordered deported; (2) the destructive device offense was not a crime of moral turpitude and therefore was not covered by the JRAD; and (3) additionally, the destructive device offense formed the basis for deportation under another subsection of *§ 1251*, which was amended in 1990 to [**5] apply to aliens like Yacoubian. The INS also argued that, under the principle of exhaustion of administrative remedies, Yacoubian was obligated to contest the INS's actions during deportation proceedings before the immigration court, not before the district court.

The district court held that the INS had violated the JRAD and permanently enjoined the INS from initiating deportation proceedings against Yacoubian on any grounds based on the three convictions in this case. This appeal followed.

## STANDARD OF REVIEW AND JURISDICTION

### A. Standard of Review

[HN2] This court reviews issues of law like jurisdiction, separation of powers, ex post facto and double jeopardy claims de novo. *See generally United States v. McConney, 728 F.2d 1195, 1201-04 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S. Ct. 101, 83 L. Ed. 2d 46 (1984)*. "A district court's grant of permanent injunctive relief is reviewed for an abuse of discretion or application of erroneous legal principles." *Dexter v. Kirschner, 984 F.2d 979, 982 (9th Cir. 1992)*.

### B. Jurisdiction

In general, [**6] the district court had jurisdiction under *18 U.S.C. § 3231* and *8 U.S.C. § 1251(b)*.

In general, we have jurisdiction pursuant to *28 U.S.C. § 1291*. However, Yacoubian claims that we lack jurisdiction over all or a part of this appeal, and the INS claims that the district court (and ultimately this court) lacked jurisdiction to decide the merits of the issues leading to the violation order in the first place. [1] Before considering the merits, we must address these threshold arguments.

1 The district court construed the JRAD, found a contempt, and enjoined future deportation proceedings. We need not, and do not, consider any separate contempt issues because their determina-

tion must, in any event, fall with the remainder of the district court's order.

### 1. The Notice of Appeal

Yacoubian contends that the INS did not file its Notice of Appeal from the district court's order in a timely manner. He argues that although [**7] the order itself was civil in nature, the dispositive factor under *Fed.* [*4] *R. App. P. 4 (1993)* is the nature of the case in which the order was granted, and because the order was issued "in a criminal case", the INS was required to (but did not) file its Notice of Appeal within thirty days of the order's entry. *Fed. R. App. P. 4(b)*. The INS counters that since it is appealing from a civil proceeding which occurred during the course of a criminal case, the sixty day time limit for appeals in civil cases under *Fed. R. App. 4(a)(1)* applies and its appeal (filed 56 days after entry of the order) is therefore timely. We agree that the civil time limit applies.

Based on the plain language of *Rule 4* alone, Yacoubian does have an appealing argument. *Rule 4* speaks of the time for appeal being based on the nature of the case, not the particular order involved. *Rule 4(a)* is entitled "Appeals in Civil Cases" and prescribes a 60 day time limit for appeals by the United States "in a civil case", whereas *Rule 4(b)* contains the heading "Appeals in Criminal Cases" and states "in a criminal case the notice of appeal . . . by the INS . . . shall be filed . . . within thirty days after the entry of" the [**8] order appealed from. We have usually favored a plain reading of the rule and have refused to "rewrite [it] to make it apply to proceedings that are not within its clearly stated scope." *In re Grand Jury Proceedings (Manges), 745 F.2d 1250, 1251 (9th Cir. 1984)* (refusing to apply *Rule 4(b)* time limits to an appeal from an order quashing a grand jury subpoena because a claim concerning a grand jury subpoena is a civil action and is therefore subject to the time limits in *Rule 4(a)*).

Nonetheless, our previous rulings indicate that *Rule 4(a)*, the civil notice of appeal provision, should apply here because we are being asked to review a civil order, even though it was issued in a criminal case. In *United States v. Kismetoglu, 476 F.2d 269, 270 n.1 (9th Cir.) (per curiam), cert. dismissed, 410 U.S. 976, 93 S. Ct. 1454, 35 L. Ed. 2d 709 (1973)*, we held that the government's appeal of an order enjoining it from filing a forfeiture action against an acquitted defendant in a criminal case was subject to the civil appeal provisions in *Fed. R. App. P. 4(a)* because "although [**9] incorporated in a judgment in a criminal proceeding, the injunction appealed from [was] civil in nature . . . ." Conversely, in *Yasui v. United States, 772 F.2d 1496, 1499 (9th Cir. 1985)*, we declined to apply the civil time limit to a notice of appeal of a denial of a post-sentence petition for

000033

24 F.3d 1, *; 1994 U.S. App. LEXIS 10368, **;
29 Fed. R. Serv. 3d (Callaghan) 331; 94 Cal. Daily Op. Service 3315

writ of error *coram nobis* which alleged that the curfew law under which the petitioner had been convicted was unconstitutional. Our reason was that the petition constituted "a step in the criminal case" in light of its purpose of "setting aside [] the petitioner's criminal indictment and conviction." We distinguished appeals of rulings on *28 U.S.C. § 2255* motions to set aside criminal convictions, which are statutorily governed by the civil appeal provision, on the ground that " *28 U.S.C. § 2255* . . . establishes a special, statutory remedy with its own particular procedural requirements and limitations, and explicitly authorizes the taking of appeals as in habeas corpus cases. No such structure surrounds the *coram nobis* writ." *Id.* Taken together, *Kismetoglu* and *Yasui* [**10] indicate that even in a criminal case where a civil order, which does not constitute a "step in the criminal case," is appealed from, the civil time limits in *Rule 4(a)* apply.

In the instant case, the INS appeals an order directed against it, which, as to it, constitutes a civil action or proceeding. *See, e.g., In re Grand Jury Proceedings, 894 F.2d 881, 882 (7th Cir. 1989)* ("A federal civil contempt proceeding is a civil proceeding governed by the rules of civil procedure."); *Rogers v. Webster, 776 F.2d 607, 610 (6th Cir. 1985)* ("Civil contempt is a civil action and governed by the Federal Rules of Civil Procedure."). It was not a party in the criminal case. Also, although the order and injunction emanate from a JRAD made in a criminal case, the ruling appealed from is directed toward civil proceedings - deportation. Moreover, the order appealed from did not constitute a step in the criminal case in which it was issued because it did not seek an adjudication concerning Yacoubian's criminal conviction; rather, it sought to enforce the court's previous collateral order recommending against deportation. *See Mahler v. Eby, 264 U.S. 32, 39, 44 S. Ct. 283, 286, 68 L. Ed. 549 (1924)* [**11] ("It is well settled that [HN3] deportation, while it may be burdensome and severe for the alien, is not a [criminal] punishment."); [*5] *United States v. Koziel, 954 F.2d 831, 835 (2d Cir. 1992)* (although "Congress [] intended JRADs to be closely tied to the sentencing process, . . . [and] the denial of a JRAD to be part of the 'penalty' imposed on a person convicted of the specified crimes, . . . there can be no doubt . . . that it is a *civil* penalty.") (citations omitted) (emphasis in original). The mere fact that the JRAD is part of the sentencing process does not convert *it* or proceedings enforcing it into criminal proceedings. *Id; see also United States v. Murphey, 931 F.2d 606, 609 (9th Cir. 1991)* (statute eliminating JRADs mooted cases then on appeal, for even if district court erred in denying JRAD the error could not be corrected). Therefore, we determine that the civil appeal time limits under *Fed. R. App. P. 4(a)(1)* apply and the INS's notice of appeal was therefore timely filed.

*2. Review of the Merits of the JRAD*

Yacoubian next contends that, to the extent the INS seeks to challenge the merits of the [**12] district court's issuance of the JRAD (specifically, its implicit conclusion that Yacoubian's destructive device conviction constituted a crime of moral turpitude), we cannot consider the INS's appeal because it failed to timely contest the JRAD itself in the district court at the time of its issuance or on direct appeal to this court. The issue is not strictly jurisdictional but Yacoubian is correct so we discuss it here. [HN4] "A judgment or decree of this court, if appealable, is, after no appeal is taken, conclusive upon the parties." *International Mfg. Co., Inc. v. Landon, Inc., 327 F.2d 824, 825 (9th Cir. 1964)* (per curiam); *see also Hook v. Arizona, Dep't of Corrections, 972 F.2d 1012, 1017 (9th Cir. 1992)* ("The consent decree is a final, binding judgment that was never appealed. Therefore, we refrain from addressing the [INS's] . . . argument . . . ."). Because the INS failed to appeal the JRAD order to this court in order to contest the district court's finding that Yacoubian's destructive device conviction constituted a crime of moral turpitude, it cannot now collaterally attack that finding in this court by challenging [**13] the contempt order issued to enforce it. *See Landon, 327 F.2d at 825* ("The appellants cannot collaterally attack the [injunction] order of July 2, 1963, now final, by appealing from the order of November 19, 1963," by which the district court refused to modify or dissolve the injunction.). Therefore, we decline to entertain the INS's ill-timed argument that the destructive device offense of which Yacoubian was convicted was not a crime of moral turpitude.

*3. The District Court's Jurisdiction to Enforce its JRAD Order*

The INS claims that Yacoubian should have presented his arguments concerning the effect of the district court's JRAD during the course of the deportation proceedings sought to be instituted, and that by bringing his grievances to the district court in the first instance Yacoubian failed to exhaust his administrative remedies. Therefore, it says the district court lacked jurisdiction to issue any order to enforce the JRAD. We cannot agree.

The INS's position is based upon a faulty premise. Title 8, *Section 1105a(c)*, on which the INS relies, [HN5] provides that "an order of deportation or of exclusion shall not be reviewed by any court if the [**14] alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations . . . ." Nothing in that provision removes the power of a district court to enforce its own properly issued orders. "There [is] no question that courts have inherent power to enforce compliance with their lawful orders . . . ." *Shillitani v. United States, 384 U.S. 364, 370, 86 S. Ct.*

24 F.3d 1, *; 1994 U.S. App. LEXIS 10368, **;
29 Fed. R. Serv. 3d (Callaghan) 331; 94 Cal. Daily Op. Service 3315

1531, 1535, 16 L. Ed. 2d 622 (1966); see also Hook, 972 F.2d at 1014 ("A district court retains jurisdiction to enforce its judgments . . . ."). Moreover, a valid JRAD "is absolutely binding on the Attorney General and leaves him with no discretionary authority." Velez-Lozano v. INS, 150 U.S. App. D.C. 214, 463 F.2d 1305, 1308 (D.C.Cir. 1972).

Wang Zong Xiao v. Barr, 979 F.2d 151 (9th Cir. 1992), cited by the INS for the proposition that Yacoubian was obligated to contest the INS's actions before an immigration judge, does not indicate that the district court's power to enforce its own orders was in any way circumscribed. [**15] Xiao held that, given the exhaustion mandate in 8 U.S.C. [*6] § 1105a(c) and the availability of habeas corpus relief, the district court could not exercise jurisdiction over an alien's motion for a preliminary injunction, which was filed after the INS notified him that he was being placed in administrative exclusion proceedings. In the instant case, unlike Xiao, the statutory exhaustion mandate of 8 U.S.C. § 1105a(c) does not, by its own terms, apply simply because the district court was asked to enforce its own previously-issued order. Yacoubian did not attempt to commence what amounted to a whole new district court case. Thus, Xiao is inapposite; it implies no limitation on a district court's power to enforce its own orders. That is not to say that the district court did not reach too far when it ultimately decided the case; it is only to say that it had jurisdiction over the enforcement of its own order in the first place. In other words, the district court properly had jurisdiction, and the fact that it ultimately misconstrued the outer limits of its JRAD order and the effect of that order in later [**16] proceedings does not mean that it lacked jurisdiction in the first place. [2]

> 2    We emphasize that we are dealing with a JRAD issued by a federal district court. We have no occasion to decide whether in this intensely federal area of the law a different rule should apply to JRADs issued by state courts. But cf. Haller v. Esperdy, 397 F.2d 211, 215.(2d Cir. 1968) (where INS did not have notice of a JRAD request, once the JRAD issued the INS could not deport the alien before it returned to state trial court to present its opposition to the JRAD).

## DISCUSSION

The district court appears to have believed that the JRAD had the effect of precluding any deportation proceedings against Yacoubian based upon the offenses he committed in 1982. We have no reason to believe that the district court intended to act beyond the powers conferred by former 8 U.S.C. § 1251(a)(4) when it first issued the JRAD, so we need not decide whether an at-

tempt to so exceed the [**17] power conferred by Congress would be a void act. Whatever the effect of the JRAD might have been when it was issued, what we must decide is its effect at this time. Implicit in any discussion of that issue is the question of whether the application of 8 U.S.C. § 1251(a)(2)(C), made applicable by Congress to aliens like Yacoubian after the district court's issuance of a JRAD on Yacoubian's behalf, violates the separation of powers doctrine in this case because it results in Congress' overruling of a court's final judgment. We determine that there is no separation of powers violation.

At the time the district court issued the JRAD (October, 1989), 8 U.S.C. § 1251(a)(4) (1988) was the sole deportation provision which potentially applied to the crimes of which Yacoubian was convicted. It provided:

Any alien in the United States . . . shall . . . be deported who . . . is convicted of a crime involving moral turpitude committed within five years after entry and either sentenced to confinement or confined therefor in a prison or corrective institution, for a year or more, or who at any time after entry is convicted [**18] of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct . . . .

The district court's JRAD, authorized by 8 U.S.C. § 1251(b)(2) (1988), served to preclude Yacoubian's deportation on this ground alone, and was required to be "given absolute binding effect upon deportation efforts by the I.N.S." on the basis of 8 U.S.C. § 1251(a)(4). United States v. Bodre, 948 F.2d 28, 34 (1st Cir. 1991), cert. denied, ___ U.S. ___, 112 S. Ct. 1487, 117 L. Ed. 2d 628 (1992). Although 8 U.S.C. § 1251(a)(14) (1988) also provided a separate basis for deportation of aliens who "at any time after entry, shall have been convicted of possessing or carrying in violation of any law any firearm or destructive device" as defined in 18 U.S.C. § 921(a)(3) and (4), that provision did not apply to Yacoubian in 1989 because it was then only applicable to aliens convicted on or after November 18, 1988. See Pub. L. No. 100-690, § 7348(b), 102 Stat. 4181, [**19] 4473 (1988).

However, in 1990, Congress reorganized 8 U.S.C. § 1251(a) and recodified the slightly modified firearm deportation provision at 8 U.S.C. § 1251(a)(2)(C): [HN6] "Any alien who at any time after entry is convicted under any law of . . . possessing, or carrying in violation of any law, any weapon, part, or accessory [*7] which is a firearm or destructive device . . . is deportable." The Savings Provision applicable to the amended section provided:

Except as otherwise specifically provided . . . the provisions of such section, as amended by this section,

shall apply to all aliens described in subsection (a) thereof notwithstanding that (1) any such alien entered the United States before the date of the enactment of this Act [November 29, 1990], or (2) the facts, by reason of which an alien is described in such subsection, occurred before the date of the enactment of this Act [November 29, 1990].

Pub L. No. 101-649, § 602(c), 104 Stat. 4978, 5081-82 (1990). These amendments did "*not* apply to deportation proceedings for which notice has been provided to the alien *before* March 1, 1991." *Id.* § 602(d), [**20] 104 Stat. at 5082 (emphasis added). In other words, as of November 29, 1990 - more than one year after the date of issuance of the JRAD in this case - *8 U.S.C. § 1251(a)(2)(C)* became a separate basis for deporting aliens like Yacoubian, who had been convicted of a firearm offense at any time before November 29, 1990 and for whom notice of deportation was given after March 1, 1991. *See Chow v. INS, 12 F.3d 34, 37-38 (5th Cir. 1993).* This Congressional action changed the effect of the JRAD issued in Yacoubian's case. Yacoubian was rendered deportable when previously, under the JRAD and the law at the time of the JRAD's issuance in 1989, he would not have been deportable based upon any of his convictions. That, in turn, undercut the effectiveness of the JRAD itself.

In *United States v. Klein, 80 U.S. 128, 20 L. Ed. 519 (1872)*, the Supreme Court determined that a law which deemed a presidential pardon prima facie evidence of disloyalty and cause to enter judgment for the INS in court disputes was violative of separation of powers. *Klein* involved a judgment in [**21] favor of an intestate's administrators, who asserted a claim for the proceeds of goods confiscated by the INS, based on a presidential pardon of the intestate for his participation in the rebellion which precipitated the Civil War. The Court held that the subsequently enacted congressional legislation which directed that pardons result in favorable judgments for the INS impermissibly encroached on the executive power of pardon and improperly attempted to direct courts to decide cases in a particular way.

In this case, Congress did not run afoul of *Klein* or related Supreme Court authority, *e.g., Pennsylvania v. Wheeling & Belmont Bridge Co., 59 U.S. 421, 15 L. Ed. 435 (1856)*, by amending *8 U.S.C. § 1251(a).* Rather than "impermissibly directing certain findings in pending litigation," *Gray v. First Winthrop Corp., 989 F.2d 1564, 1568 (9th Cir. 1993)* (internal quotation omitted), the amendments merely changed the underlying law so that aliens not previously deportable became deportable. Nevertheless, it could be argued that the 1990 amendments are unconstitutional [**22] on two independent grounds: the due process clause and the principle that Congress may not direct courts to reverse final judgments. *See id. at 1570-71, 1572-74.*

"The Supreme Court has consistently held that [HN7] Congress may enact legislation with retroactive effect so long as it comports with Due Process by passing constitutional muster under rational basis scrutiny." *Id. at 1570*; *see also Lehmann v. United States ex rel. Carson, 353 U.S. 685, 690, 77 S. Ct. 1022, 1024, 1 L. Ed. 2d 1122 (1957)* (determining that since Congress may legislate retrospectively, alien could be made deportable under the Immigration and Nationality Act of 1952 for 1936 convictions of crimes involving moral turpitude which were not unconditionally pardoned); *Mulcahey v. Catalanotte, 353 U.S. 692, 694, 77 S. Ct. 1025, 1027, 1 L. Ed. 2d 1127 (1957)* (alien made deportable under the 1952 Act for 1923 narcotics convictions). [HN8] While "retroactive legislation does have to meet a burden not faced by legislation that has only future effects," [**23] that burden is met "simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 730, 104 S. Ct. 2709, 2718, 81 L. Ed. 2d 601 (1984).* [HN9] *Section 1251(a)(2)(C)* survives this scrutiny because its means - retroactive application of the firearm (destructive device) conviction deportation provision - is rationally related to a legitimate [*8] governmental purpose. It results in uniform application of the deportation provision to aliens convicted of firearm offenses, no matter when those convictions occurred. [3] *See generally Gray, 989 F.2d at 1573* (setting forth rational basis rubric); H.R. Conf. Rep. No. 101-955, 101st Cong., 2d Sess. 119, 132 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6784, 6797 ("The Conference report broadens the list of serious crimes, conviction of which results in various disabilities and preclusion of benefits under the Immigration and Nationality Act."); Statement by President George Bush Upon Signing S. 358 [The Immigration and Nationality Act of 1990], [**24] 26 Weekly Comp. Pres. Doc. 1946 (Dec. 3, 1990), *reprinted in* 1990 U.S.C.C.A.N. 6801-1 ("S. 358 meets several objectives of my Administration's war on drugs and violent crime. Specifically, it provides for the expeditious deportation of aliens who, by their violent criminal acts, forfeit their right to remain in this country. These offenders, comprising nearly a quarter of our Federal prison population, jeopardize the safety and well-being of every American resident.").

3 It also draws upon Congress' undoubted power to exclude undesirable aliens from this country, even if that determination is made long after a crime was committed. *See, e.g., Mahler, 264 U.S. at 38-40, 44 S. Ct. at 286*; *Mulcahey, 353 U.S. at 694, 77 S. Ct. at 1027.*

or if the Judicial Recommendation Against Deportation was granted on or after November 29, 1990." (Emphasis added). Yacoubian contends that because the INS is obligated by its own regulation to honor the court's JRAD, it cannot deport him under the auspices of *8 U.S.C. § 1251(a)(2)(C)*. As already explained, however, the INS would not violate the JRAD by applying *section 1251(a)(2)(C)* to Yacoubian, since it would be implementing a statutory section which did not fall within the purview of the JRAD. Likewise, the INS cannot be said to violate its own regulation requiring that the JRAD be given full force and effect by applying the deportation section to Yacoubian, since it would not be contravening the terms of the JRAD itself in any way.

[**30]  In sum, Congress previously gave the Attorney General the power to deport aliens on a number of grounds, one of which was conviction of crimes of moral turpitude. It also said that if a JRAD was issued, the Attorney General could not deport an alien based upon that ground. However, it never precluded itself from changing its mind about who can stay in this country and who must leave it, and this is an area of the law where Congress *can* change its mind. The JRAD *was* effective but "in the mean time [the right it gave] has been modified by the competent authority, so that [it] is no longer [a complete] obstruction" to deportation proceedings. *Wheeling & Belmont Bridge, 59 U.S. at 431-32.*

Finally, Yacoubian argues that the application of *8 U.S.C. § 1251(a)(2)(C)* to him would violate the *ex post facto* and *double jeopardy clauses*, because his imminent deportation would constitute an impermissible double criminal punishment for the firearm offense of which he was already convicted and would impose a punishment on him which was unavailable at the time he committed, was convicted of and [**31] sentenced for that offense. His arguments are fatally flawed.

[HN11] The *ex post facto* clause of the United States Constitution prohibits the retrospective application of criminal laws that materially [*10] disadvantage the defendant. *U.S. Const. art. I, § 9, cl. 3, § 10, cl. 1.* But it only applies to criminal laws. *See, e.g., Collins v. Youngblood, 497 U.S. 37, 41, 110 S. Ct. 2715, 2718, 111 L. Ed. 2d 30 (1990)* ("It has long been recognized by this Court that the constitutional prohibition on *ex post facto* laws applies only to penal statutes which disadvantage the offender affected by them."). [HN12] The Court has consistently classified deportation proceedings as civil in

nature and has therefore determined that the *ex post facto* clause has no application to them. *See, e.g., Galvan v. Press, 347 U.S. 522, 531, 74 S. Ct. 737, 743, 98 L. Ed. 911 (1954)* ("The *ex post facto* Clause . . . has no application to deportation."); *Harisiades v. Shaughnessy, 342 U.S. 580, 594, 72 S. Ct. 512, 521, 96 L. Ed. 586 (1952)* [**32] ("Deportation, however severe its consequences, has been consistently classified as a civil rather than a criminal procedure. . . . The prohibition of *ex post facto* [therefore] has no application."). Because the change in the immigration laws only makes available the civil penalty of deportation, without increasing Yacoubian's criminal punishment, the *ex post facto* clause is inapplicable. *See Koziel, 954 F.2d at 835* ("Congress's retroactive elimination, in the 1990 Act, of a sentencing court's power to grant relief from the civil penalty of deportation does not increase the criminal penalties and hence does not violate the *Ex Post Facto* Clause."); *Bodre, 948 F.2d at 33-35* (same).

[HN13] The *Double Jeopardy Clause of the Fifth Amendment to the United States Constitution* provides that no one shall "be subject for the same offence to be twice put in jeopardy of life or limb." Like the *ex post facto* clause, this clause applies only to criminal or punitive measures successively imposed for the same criminal offense. *See, e.g., Breed v. Jones, 421 U.S. 519, 528, 95 S. Ct. 1779, 1785, 44 L. Ed. 2d 346 (1975)* [**33] ("the risk to which the Clause refers is not present in proceedings that are not 'essentially criminal'"). [HN14] Because deportation proceedings are civil and not criminal in nature, they cannot form the basis for a double jeopardy claim either.

## CONCLUSION

However the district court may feel about the merits of Yacoubian and the general sanctity of its own orders, neither its sentiments nor ours can suffice to give the district court the power to issue the order that it did.

Congress has the authority to declare that aliens who have committed certain offenses must leave our shores, regardless of when those offenses were committed. It exercised that authority here. Thus, regardless of the JRAD, Yacoubian cannot avoid facing the administrative proceeding which the INS seeks to commence against him. It is one of the perils of being a peregrine who has displeased his host. We therefore reverse the district court's order in its entirety.

REVERSED.

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

PHALY RIN

**DEFENDANTS**

R. MICHAEL MAGEE, FIELD DIRECTOR DHS, JULIE L. MYERS, ASSISTANT SECRETARY, ICE.

**(b)** County of Residence of First Listed Plaintiff   SAN DIEGO

(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   SAN DIEGO

(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

LAW OFFICES OF JOHN R. ALCORN, 17310 RED HILL AVE #140, IRVINE, CALIFORNIA 92614 (949) 553-8529

Attorneys (If Known)

'08 CV 0571 JM WMc

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1   U.S. Government Plaintiff
- ☐ 3   Federal Question (U.S. Government Not a Party)
- ☒ 2   U.S. Government Defendant
- ☐ 4   Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☒ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from another district (specify)
- ☐ 6   Multidistrict Litigation
- ☐ 7   Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

28 U.S.C. SECTION 2241

Brief description of cause:

UNLAWFUL DETENTION

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____ DOCKET NUMBER _____

DATE   3-25-08

SIGNATURE OF ATTORNEY OF RECORD   John R. Alcorn

**FOR OFFICE USE ONLY**

RECEIPT # 149129   AMOUNT $5.00   APPLYING IFP \_\_\_\_\_ JUDGE \_\_\_\_\_ MAG. JUDGE \_\_\_\_\_

Q 3/26/08

# UNITED STATES
# DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# # 149129   — SH
# * * C O P Y * *
# March 26, 2008
# 16:02:08

## Habeas Corpus
USAO #.: 08CV0571
Judge..: JEFFREY T MILLER
Amount.:                    $5.00 CK
Check#.: BC8161

## Total—>   $5.00

FROM: RIN V. MAGEE ET AL